**PRESIDENT OF THE UNITED STATES, ex rel. CAPUTO v. KELLY, Marshal, et al.**

District Court, S. D. New York.

June 8, 1937.

Lewis Landes, of New York City, for relator.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City (A. S. Edmonds, of New York City, of counsel), for French Republic.

732

LEIBELL, District Judge.

The writ of habeas corpus is dismissed, and the relator, Gennaro Caputo, is remanded to the custody of the United States Marshal.

The relator in this proceeding is held in custody by the United States Marshal under an order of the United States Commissioner for the Southern District of New York, dated May 7, 1937 (to await the action of the State Department), in certain extradition proceedings which were instituted by the Consul General of the French Republic to have the said Gennaro Caputo, alias Jean Caputo, arrested and surrendered under the extradition treaty between that country and the United States of America.

The complaint in the extradition proceeding was made by the Assistant Consul General of the French Republic of the City of New York, pursuant to authority delegated to him by the Consul General and on receipt of a letter from the Embassy of the French Republic at Washington, D. C., requesting the arrest and detention of Gennaro Caputo, a fugitive from the justice of the French Republic. Said complaint was filed in this court, and on December 14, 1936, the United States Commissioner for the Southern District of New York issued a warrant under which the said Gennaro Caputo was taken into custody by the United States Marshal. The warrant contained the following recital: "Whereas, complaint on oath has been made to me charging that Gennaro Caputo, alias Jean Caputo, also alias Caputo Gennaro, is in the City, State and Southern District of New York as a fugitive from the justice of the French Republic, and charging said Gennaro Caputo, alias Jean Caputo, also alias Caputo Gennaro with having committed within the jurisdiction of the French Republic the crime of murdering one Marie Girére on January 14, 1923, at about eleven o'clock in the forenoon of that day, at Figuier de Cassis Street, Marseilles, France, and of assaulting with a deadly weapon with intent to kill one Sauveur Viola, and having been convicted of said crimes on January 31, 1924, at the Assizes Court, at Aix, District of Bouches de Rhone, France, and sentenced to death, said crimes being provided for by the Treaty or Convention for Extradition between the Government of the United States of America and the Government of the French Republic signed January

9[6], 1909 and proclaimed July 26, 1911, as set forth in the sworn complaint of Rene Tanqrerey hereto attached."

Paragraph 4 of the complaint of the Assistant French Consul on which the warrant was issued states: "Upon information and belief, the said Gennaro Caputo, alias Jean Caputo, also alias Caputo Gennaro is a fugitive from the justice of the French Republic, having been charged with committing the crime of murdering one Marie Girére on January 14, 1923, at about eleven o'clock in the forenoon of that day, at Figuier de Cassis Street, Marseilles, France, and of assaulting with a deadly weapon with intent to kill one Sauveur Viola, and having been convicted of said crimes on January 31, 1924, at the Assizes Court, at Aix, District of Bouches de Rhone, France, and sentenced to death."

The complaint also contains the allegation that: "7. The crimes with which the said Gennaro Caputo, alias Jean Caputo, also alias Càputo Gennaro, is charged and of which he has been convicted of having committed in the French Republic are among the offences enumerated in the Treaty existing between the United States and the French Republic signed January 9[6], 1909, proclaimed July 28, 1911, Art. II, Sec. 1 (copy annexed as Appendix A)."

The annexed Appendix A is as follows:

"Section 1 of Article II of the Treaty existing between the United States and the French Republic signed January 9[6], 1909, proclaimed July 28[26], 1911, [37 Stat. 1527], provides as follows:

" 'Extradition shall be granted for the following crimes and offences:

" '1. Murder, assassination, parricide, infanticide and poisoning; manslaughter, when voluntary; assault with intent to commit murder.' "

After the arrest of Caputo on the warrant, a hearing was held before the United States Commissioner. 18 U.S.C. § 651 (18 U.S.C.A. § 651). At the termination of the hearing on May 7, 1937, the Commissioner rendered his decision as follows: "After carefully weighing the evidence and looking into the law in the premises I find that Gennéro Caputo, with various aliases, is the man mentioned in the warrant issued by the French Court at Marseilles, France; I further find there is probable cause to believe that he committed the crime mentioned in the said warrant, and he is re-

manded to the custody of the United States Marshal for the Southern District of New York to await the decision of the State Department of the United States Government."

On May 7, 1937, the Commissioner issued an extradition commitment in which it was "ordered that said defendant Gennéro Caputo, with aliases, be held to await the action of the Department of State and any order of court and that no bail fixed and that he be committed to the custody of the United States Marshal for the Southern District of New York, and by said Marshal duly committed to the custody of the Warden of the Federal Detention Headquarters, 11th, and West St., in the Borough of Manhattan, City of New York."

On May 10, 1937, the said Gennaro Caputo sued out a writ of habeas corpus in this court directed to the United States Marshal and returnable on May 13, 1937, at which time it was adjourned to May 18, 1937, and the hearing on the writ took place on that day. The return to the writ included some 260 pages of testimony and a number of exhibits that were offered in evidence at the hearing before the Commissioner.

In his petition for a writ of habeas corpus the said Gennaro Caputo contends that his detention and imprisonment are unlawful and improper and without legal warrant or authority, and in support thereof he advances nine reasons separately stated in nine subdivisions of paragraph sixth of his petition, dated May 10, 1937.

■ 1. In the eighth subdivision of said paragraph relator contends that: "There was a material variance between the warrant of arrest and executive requisition of the French Republic." Relator does not mean the warrant of arrest signed by United States Commissioner Cotter. The brief submitted in relator's behalf refers to a warrant of arrest (Document No. 3 in Exhibit 1) issued January 25, 1923, by an examining magistrate in France against Jean Caputo for attempted murder and for having willfully inflicted blows and wounds. It is argued that said warrant is not in accord with the executive requisition herein (the petition of the Assistant Consul General of the French Republic dated December 14, 1936) which prayed for the arrest of the accused for the murder of Marie Girére and the assault with intent to kill one Sauveur Viola.

The extract from the records of the office of the clerk of the Court of Appeals of Aix-en-Provence (Bouches du Rhone), document No. 8 of Exhibit 1, recites the indictment of Caputo for the two crimes—homicide upon the person of Marie Girére, and attempt to commit homicide upon the person of Viola Sauveur—and then states the following: "The Court orders all the sheriffs or agents of the Police, upon demand, to bodily seize, carry and deliver said accused at the Court detention house annexed to the Court of Assizes, to which Court the accused is hereby referred."

This is the real order or warrant of arrest of the French court. It is dated June 28, 1923, and apparently was based upon the indictment of the accused in the French court for both crimes. The warrant of arrest referred to by petitioner, dated January 25, 1923, appears to be a preliminary warrant of arrest made by an examining magistrate and referred to only one crime. The executive requisition of the French Republic as set forth in the complaint of the Assistant Consul General in this extradition proceeding conforms to the arrest provisions of the order of the French court, dated June 28, 1923.

■ 2. In subdivision sixth of paragraph sixth of relator's petition herein, it is urged that there "was lack of evidence of an indictment against your petitioner issued by the French Republic." In document No. 8 in Exhibit 1 there is a record of the decision dated June 28, 1923, of the Indictment Chamber (Chambre des Mises en Accusation) sending Caputo before the Court of Assize of Bouches-du-Rhone. Document No. 9 of Exhibit 1 is a copy of the judgment of the Court of Assize of Bouches-du-Rhone condemning Caputo by default (par contumance) to death. The following paragraphs are quoted from said judgment:

"Having examined the decision stating the charges and referring the case to the Court of Assizes of the Department of the Bouches du Rhone, (such decision) emanating from the Court of Appeals of Aix (Chambers of Indictments), and dated June 28, 1923, * * *

"Having examined the Warrant of Body Attachment issued against the person of the accused and the Indictment submitted by the Attorney General in accordance with the decision above referred to;

"Having examined the Report stating that notice of the decision and indictment

have been given, together with protocols reporting the investigation made; * *. *

"Having examined Reports ascertaining that all formalities prescribed by article 466 of the Code of Criminal Examination were complied with;

"Having heard the oral report of the President * * *

"Whereas from the documents adduced it appears

"1. That Caputo Gennaro is guilty of having voluntarily caused the death of a certain Girére Marie at Marseille on January 14, 1923.

"2. That Caputo Gennaro is guilty of an attempt to voluntarily cause the death of Mr. Viola Sauveur in Marseille on January 14, 1923. * * *

"The Court declares Caputo Gennaro to be indicted for the crimes above specified, described and proved.

"And,

"In reparation and for the purpose of punishment in accordance with the provisions of the articles above mentioned

"The Court condemns the said Caputo Gennaro to death." ·

The above quotations are from the translation (Exhibit 2) of the formal documents (Exhibit 1) put in evidence before the United States Commissioner and duly certified by the American Ambassador at Paris "as properly and legally authenticated so as to entitle them to be received in evidence for similar purposes by the tribunals of France, as required by the Act of Congress of August 3, 1882." 18 U.S.C. § 655 (18 U.S.C.A. § 655). They clearly show that there was an indictment found against the petitioner in the French court charging petitioner with the crimes on which his extradition is sought.

3. In subdivision 9 of paragraph sixth of relator's petition herein it is asserted that: "There was failure of the French Republic's requisition to show that the provisions of the French Penal Code were those in force when the act was committed." The answer to that contention is found in the aforementioned judgment of the French court, in which there are set forth in full the provisions of the French Penal Code applicable in 1923 to the crimes of murder and attempted homicide and the punishment thereof; and immediately following said provisions there appears in said judgment this statement: "The Court de- clares Caputo Gennaro to be indicted for the crimes above specified, described and proved."

The crimes of "homicide" and "murder" as defined in the French Penal Code, quoted in the judgment of the French court, correspond to the definitions of "homicide" and "murder" as set forth in sections 1042 and 1044 of the New York Penal Law (Consol.Laws N.Y. c. 40). The crime of "assault with intent to kill" or a "willful attempt to commit a homicide," as described in the judgment of the French court, corresponds to the definition of an "attempt to commit a crime." Sections 260 and 261 of the Penal Law of New York State. "These [section 260 and section 261] sections are sufficiently broad to include an attempt to commit murder." See U. S. ex rel. Di Stefano v. Moore (D.C.) 46 F.(2d) 308, 309.

4. In subdivisions 1, 2, 3, 4, 5, and 7 of paragraph sixth of relator's petition herein, he contends in effect that there was no legal and competent evidence under the laws of the State of New York connecting him with the crimes charged, that the evidence before the United States Commissioner was insufficient to constitute probable cause, that the hearsay character and the insufficiency of the evidence could not sustain the extradition, and that the Commissioner was obliged to follow the law of the State of New York and failed to do so.

Exhibit 1 in the extradition proceeding contains copies of depositions made by certain French police officers before an Examining Magistrate in France in January, February, and March of 1923. They are part of the records of the office of the clerk of the Court of Appeals of Aix-en-Provence (Bouches du Rhone).

The deposition of Blanadet, the Police Commissioner of the City of Marseille, states that he was informed of the shooting about 11:15 a. m. on January 14, 1923, and that he immediately rushed to the hospital where Marie Girére declared to him spontaneously:

"My name is Girére Marie; my age is nineteen years; I was born in Lyon (Rhone) on February 20, 1904; I am the unmarried daughter of Charles and Marguerite Girard; I am a prostitute, without fixed domicile.

"Approximately nine months ago I met a man named Caputo, Jean, residing at No. 7 Rue Caisserie with whom I lived as husband and wife.

"Three days go, pressed by his repeated demands for money, I broke my relations with him; I also left him because he used to beat me. Today the 14th of January, around 11:00 a. m. he met me on Rue de Figuier de Cassis, at the crossing of Rue Caisserie, and he insisted on my going with him. Upon my unequivocal refusal, he discharged several revolver shots at me, hitting me in the abdomen. I was carried over to the hospital by private individuals.

"Having shot at me Caputo immediately fled."

Later the same day, January 14, 1923, at 4 p. m., Blanadet again visited the hospital where the wounded person, Marie Girére, made the following additional statement to him: "I have no more money; I had 25 francs which I handed over to Caputo at the time of our argument in order that he should leave me alone. Thereupon I turned my back to him in order to depart and it was then that he shot at me. He was not working at the time."

Blanadet's statement also recites: "Having on January 15, 1923, at 6 o'clock inquired of the condition of the person wounded, it was reported to me that her condition was as serious as before and that there was little hope to save her life. The family in Lyon has been informed."

The deposition of Robert André, Special Commissioner of "Sureté" of the City of Marseille, contains the report made to him by two of his inspectors Herman and Pujol when on January 16, 1923, at 4 o'clock, they reported to the Special Commissioner that the man who did the shooting was Caputo Jean and "that he could be identified by Marie Girére, the wounded person." They state in their report: "We hereby inform you that the condition of Girére Marie, the wounded person, is grave and we hereby report the result of our investigations. The wounded persons are at the hospital (Hotel Dieu)."

André Robert instructed his secretary Peretti and the two inspectors Herman and Pujol to again visit the hospital on the 16th day of January, and the following is quoted from their report on said visit:

"Upon your instructions I reported today to the hospital (Cazaul ward, bed 6 bis), accompanied by Inspectors Herman and Pujol.

"I showed the wounded person known as Girére Marie, born in Lyon on the 20th day of February, 1904, unmarried, daughter of Charles and Marguerite Girard, and having no fixed domicile, several anthropometric photographs, from among which she definitely identified Caputo Gennaro, as being the man who shot several times at her with a revolver on January 14th last, around 11:00 a. m. on Rue Figuier de Cassis; she so identified him several times by nodding her head.

"The condition of the wounded person did not permit further questioning and she could not affix her signature, two fingers of her right hand having been amputated.

"Moreover, her general condition did not allow her to do so (i. e., to sign)."

The extract from the records of the office of the clerk of the Court of Appeals of Aix-en-Provence (Bouches du Rhone) also contains a deposition of Blanadet, from which the following is quoted:

"My name is Blanadet, Philippe; I am forty-six years of age; I am Police Commissioner of the Twenty-Fifth District of Marseille.

"Having been informed that a woman wounded by several revolver shots had been transported to the hospital, I immediately reported to said hospital, this being approximately at 11:00.

"I found the named Marie Girére on the operating table. I asked her who had wounded her.

"She replied that it was a certain 'Caputo Jean' with whom she had been living as husband and wife for several months.

"The wounded person told me that she had left this man because he was beating her and asking for money.

"She added that she had met him a few moments prior (prior to the shooting) on Figuier de Cassis Street; that 'Caputo' asked her to resume their joint living and that she rejected said offer; that she gave him 25 francs (all the money she had with her); that she so gave him this money in order that he would leave her alone; and that at the very time she was proceeding away from him, 'Caputo' fired at her several revolver shots."

In Exhibit 1 there are copies of other affidavits of police officers to the effect that Marie Girére, being shown several photographs, designated from them the one that

was Jean Caputo and that she was in possession of all of her faculties at the time.

In my opinion there is enough set forth in the depositions as to the surrounding circumstances under which she made the declarations to show that she realized that she was about to die. The judgment states: "The named Marie Girére was wounded by three firearm bullets in the loin region. The bullets pierced the abdomen, perforating the intestines in eight places and causing acute peritonitis, which brought her to her death."

The record does not contain anything she said to the effect that she was about to die; but the fact that she had been shot in the abdomen, the nature of her wounds, the operation, the fact that she was unable to talk, and able only to nod her head when she identified the picture of Caputo at the time of her last interview by the police, sufficiently indicate that at the time she made the declarations she must have realized that death was imminent. She died of acute peritonitis on the second day following the shooting. Her "state of mind" is "exhibited in the evidence" and "not left to conjecture." Shepard v. United States, 290 U.S. 96, 100, 54 S.Ct. 22, 24, 78 L.Ed. 196. Her statements, in so far as they describe the shooting and identify the slayer, would therefore be admissible.

The following quotation from Wigmore, Evidence, § 1442, properly applies to these circumstances:

"In ascertaining this consciousness of approaching death, recourse should naturally be had to all the attending circumstances.

"It has been contended that only the *statements of the declarant himself* could be considered for this purpose; or, less broadly, that the *nature of the injury alone* could not be sufficient, i. e., in effect, that the declarant must have shown in some way by conduct or language that he knew he was going to die. This, however, is without good reason. We may avail ourselves of any means of inferring the existence of such knowledge, and, if in a given case the nature of the wound is such that the declarant must have realized his situation, our object is sufficiently attained. Such is the settled judicial attitude."

In People v. Sarzano, 212 N.Y. 231, at page 235, 106 N.E. 87, 88, the Court of Appeals of New York in a per curiam opinion stated: "Declarant's certainty that he is about to die and lack of all hope of recovery may be proven by his express language or conduct, or inferred from his physical condition and obvious danger, or evidence of his acquiescence in the opinions of doctors or others stated to him, or other adequate circumstances. Williams v. State, 168 Ind. 87, 79 N.E. 1079; State v. Sullivan, 20 R.I. 114, 37 A. 673."

In Mattox v. United States, 146 U.S. 140, 151, 13 S.Ct. 50, 53, 36 L.Ed. 917, it was held: "Dying declarations are admissible on a trial for murder, as to the fact of the homicide and the person by whom it was committed, in favor of the defendant as well as against him. 1 East, P.C. 353; Rex v. Scaife, 1 Moody & R. 551; United States v. Taylor [Fed.Cas. No.16,436] 4 Cranch, C.C. 338; Moore v. State, 12 Ala. 764 [46 Am.Dec. 276]; Com. v. Matthews, 89 Ky. 287, 12 S.W. 333. But it must be shown by the party offering them in evidence that they were made under a sense of impending death. This may be made to appear from what the injured person said; or from the nature and extent of the wounds inflicted being obviously such that he must have felt or known that he could not survive; as well as from his conduct at the time and the communications, if any, made to him by his medical advisers, if assented to or understandingly acquiesced in by him."

The picture of the relator, identified by his victim, Marie Girére, is part of Exhibit 3. The side face view is like relator's picture in the record of the Police Department of New York City (Exhibit 1). Relator's fingerprints (on the same card with the police photographs) taken in France on the occasion of his first arrest in September, 1917, were compared by experts of the New York Police Department with his fingerprints taken on occasions when he was under arrest in New York City. They are the same. Relator's police record—a list of his crimes committed in Marseille, France, where this murder was perpetrated—included a conviction in September, 1917, for attempted theft and for carrying prohibited firearms; a conviction on October 13, 1919, for assault and battery and for carrying prohibited firearms; and a conviction for assault and battery on June 27, 1922. In September, 1926, May, 1927, and December, 1936, he was under arrest and fingerprinted in New York City, but the minutes of the extradi-

tion hearing do not disclose the charges on which he was arrested here.

█ ' On the oral argument before me, relator's counsel contended that the statements made by the victim of the shooting, Marie Girére, to the French police on January 14th and January 16th, shortly before she died, are hearsay, in that they were not made under such circumstances·as are required by the law of this state to make the declarations admissible in evidence at a murder trial, as the dying declarations of the victim. It may appear to be a close question, in this case. But even assuming that the alleged dying declarations fall short of being such, that does not make them inadmissible as evidence in the extradition· proceeding.

As was stated by Judge Knox in United States ex rel. Klein v. Mulligan (D.C.) 1 F. Supp. 635, 636, the court must keep in mind, in passing upon writs of habeas corpus such as this, that, "Extradition proceedings are not criminal in their nature, even though punishment may hereafter be imposed upon the relator in the demanding jurisdiction if he shall be convicted of the crime there charged against him." '

██ Further, it has been uniformly held that in extradition proceedings foreign depositions, or affidavits properly authenticated by the French authorities and duly certificated by our diplomatic representative (18 U.S.C. § 655 [18 U.S.C.A. § 665]), may be received in evidence by the Commissioner even though they contain hearsay evidence. Likewise, the fact that the statements of foreign witnesses are merely signed and not sworn to does not make such statements inadmissible as evidence in extradition proceedings, when they are properly authenticated and duly certified as aforesaid.

There was an appeal of the Klein Case to the Circuit Court of Appeals, where it was affirmed, 50 F.(2d) 687, 688, Judge Swan writing: "It is urged that there is a complete failure of proof as to the worthlessness of the shares, since the only evidence thereof is hearsay. This contention is without merit. By virtue of the Act of August 3, 1882 (18 U.S.C.A. § 655), the depositions taken in England, and properly authenticated were competent evidence. Indeed, the objection urged is not to their reception in evidence but to the sufficiency of what they contain. The hearsay character of a statement is of course a

factor to be considered in determining the weight to be accorded it, but that is as far as the hearsay objection goes in a proceeding like the present. See Collins v. Loisel, 259 U.S. 309,. 317, 42 S.Ct. 469, 66 L.Ed. 956; 1 Wigmore, Evidence (2d Ed.) p. 21. Newman, an official examiner, deposed that the government brokers with whom he had been in communication reported to him that the shares were entirely worthless. This is enough on the issue of probable cause.".

In the case of Ex parte Glaser, 176 F. 702, 704, the Circuit Court of Appeals also held that the uncorroborated testimony of an accomplice, in foreign depositions, could be thus received in evidence in extradition proceedings, despite the provisions of the New York Code (Code of Criminal Procedure § 399) that conviction cannot be had on the uncorroborated testimony of an accomplice.

In paragraph fifth of relator's petition he quotes the following from the Extradition Treaty between the French Republic and the United States of America: "The Government of the United States and the Government of France mutually agree to deliver up persons who, having been charged with or convicted of any of the crimes or offences specified in the following article, committed within the jurisdiction of one of the contracting parties, shall seek an asylum or be found within the territories of the other: Provided that this shall only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his or her apprehension and commitment for trial if the crime or offence had been there committed."

In Collins v. Loisel, 259 U.S. 309, at page 317, 42 S.Ct. 469, 472, 66 L.Ed. 956, Mr. Justice Brandeis wrote: "The phrase 'such evidence of criminality,' as used in the treaty, refers to the scope of the evidence or its sufficiency to block out those elements essential to a conviction. It does not refer to the character of specific instruments of evidence or to the rules governing admissibility. Thus, unsworn statements of absent witnesses may be acted upon by the committing magistrate, although they could not have been received by him under the law of the state on a preliminary examination. Elias v. Ramirez, 215 U.S. 398, 30 S.Ct. 131, 54 L.Ed. 253; Rice v. Ames, 180 U.S. 371, 21 S.Ct. 406, 45 L.Ed.

577. And whether there is a variance between the evidence and the complaint is to be decided by the general law and not by that of the state. Glucksman v. Henkel, 221 U.S. 508, 513, 31 S.Ct. 704, 55 L.Ed. 830. Here the evidence introduced was clearly sufficient to block out those elements essential to a conviction under the laws of Louisiana of the crime of obtaining property by false pretenses. The law of Louisiana could not, and does not attempt to, require more. It is true that the procedure to be followed in hearings on commitment is determined by the law of the state in which they are held. In re Farez, 7 Blatchf. 345, Fed.Cas.No.4,645; In re Wadge [(D.C.) 15 F. 864] supra; In re Kelley (D.C.) 25 F. 268; In re Ezeta (D.C.) 62 F. 972, 981. But no procedural rule of a state could give to the prisoner a right to introduce evidence made irrelevant by a treaty."

And at page 316 of 259 U.S., at page 472 of 42 S.Ct., 66 L.Ed. 956: "The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction. Grin v. Shine, 187 U.S. 181, 197, 23 S.Ct. 98, 47 L.Ed. 130; Benson v. McMahon, 127 U.S. 457, 461, 8 S.Ct. 1240, 32 L. Ed. 234; Ex parte Glaser, 176 F. 702, 704, 100 C.C.A. 254."

In Elias v. Ramirez, 215 U.S. 398, at page 409, 30 S.Ct. 131, 136, 54 L.Ed. 253, Mr. Justice McKenna stated: "It is further contended that the statements of Rosas and Enriquez were unsworn to, and because unsworn to were not admissible in evidence; that 'under the common law and the law of Arizona the unsworn statement of no witness is competent upon a preliminary hearing before a committing magistrate,' and would not justify a commitment for trial in Arizona. It is hence contended that it was not sufficient to justify the extradition of the appellee. Re Ezeta [D.C.] 62 F. 972; Re McPhun, 24 Blatchf. 254, 30 F. 57; Benson v. McMahon, 127 U.S. 457, 8 S.Ct. 1240, 32 L.Ed. 234, are adduced to sustain the contention. The answer to the contention is that the statute providing for extradition makes the depositions receivable in evidence, and provides that their sufficiency to establish the crime shall be such as to create a probability of the commission by the accused of the crime charged against him. This is the principle announced by the cases cited by the appellee."

Exhibit 1, containing the depositions of the French police officers in which they recite the so-called dying declarations of the murdered woman, are made competent evidence in the extradition proceeding by federal statute, 18 U.S.C. § 655 (18 U.S. C.A. § 655).

The duty of the Government of the United States under its extradition treaty with the French Republic is clearly defined in the following quotation from the opinion of Mr. Justice Holmes in the case of Glucksman v. Henkel, 221 U.S. 508, at page 512, 31 S.Ct. 704, 705, 55 L. Ed. 830: "It is common in extradition cases to attempt to bring to bear all the factitious niceties of a criminal trial at common law. But it is a waste of time For while, of course, a man is not to be sent from the country merely upon demand or surmise, yet if there is presented, even in somewhat untechnical form according to our ideas, such reasonable ground to suppose him guilty as to make it proper that he should be tried, good faith to the demanding government requires his surrender. Grin v. Shine, 187 U.S. 181, 184, 23 S.Ct. 98, 47 L.Ed. 130, 133, 12 Am. Crim.Rep. 366. See Pierce v. Creecy, 210 U.S. 387, 405, 28 S.Ct. 714, 52 L.Ed. 1113, 1122. We are bound by the existence of an extradition treaty to assume that the trial will be fair."

5. One of the crimes charged in the indictment of Caputo is assault with attempt to kill Viola Sauveur. Viola Sauveur was passing the spot at which Marie Girére was murdered and two of the bullets entered his arm.

On January 14, 1923, Sauveur, a sailor born in Corsica and a resident of Marseille, made this statement:

"Today, the 14th of January, around 11:00 a. m., when passing on the Rue Figuier a Cassis, I noticed, at the intersection of said street with the Rue Caisserie, the presence of a woman. I did not notice whether this woman, whom I did not know, or at least whom I know only by sight, was accompanied by a man;

"Just as I was passing by her and when I was turning my back to her I heard several shots. At the moment when I turned back to see what was happening, I was wounded in the left arm by two bullets.

I saw nothing further and I am not in a position to furnish any further details."

Sauveur (who had been sentenced in 1918 for theft and violence) was questioned at the hospital by Robert, the Police Commissioner, and signed a statement reading as follows on January 16, 1923:

"I am completely foreign (to the substance of the inquiries) and I am completely ignorant why a man, whom I do not know, shot several times with a revolver at a woman on Sunday, January 14, 1923, at approximately 11:00 a. m., at the moment I was passing on Rue Figuier de Cassis at the crossing of Rue Caisserie.

"I could not see the man who shot and I cannot identify him from the photographs which you are showing to me.

"I do not know the man nor the woman and I cannot furnish you with any details."

Blanadet's statement contains the following reference to Viola Sauveur:

"Marie Girére told me nothing about Viola who was wounded at the same time as she was.

"I brought him to her at the hospital and she told me that she did not know him. Viola on his own behalf told me that he knew the said Girére 'but only by sight'. 'Viola' told me that he saw the said Girére alone on the Figuier de Cassis Street at the time when she was going away and that almost instantly he heard several shots.

"He felt that he was wounded in the left arm but that he was not curious enough to turn around to see who wounded him."

In Exhibit 4 there is a report, dated December 31, 1936, from the Police Commissioner of Marseille, which accompanied certain police records in relation to Caputo (Exhibit 3): "One of the victims, Mr. *Viola* Sauveur, known as 'Pas de Chance' ('No Chance'), born September 6, 1900 at Calcatoggio (Corsica), son of Louise and *Scaglia* Louise, who resided in our city No. 52 Albrand Street and latter at No. 20 Bouterie Street, etc., * * * was not discovered in Marseille and according to information received by Inspector *Collomb*, employed by me, the said *Viola* died while residing with his sister at Bone (Algeria) in or about July, 1927. This fact could be confirmed by the Mayor of Calcatoggio (Corsica)."

It appears further that "all witnesses capable of identifying Caputo are at present dead" so far·as the French police know (Exhibit 4).

 There is nothing in the statement of Sauveur made to the police officers that directly connects Caputo with either crime, but it is reasonable to infer from Sauveur's testimony that the man who shot Marie Girére is the man who shot him, Sauveur. Marie Girére on several occasions at the hospital stated to various police officers that it was Caputo who shot her. Sauveur's statement coupled with that of Marie Girére certainly furnishes probable cause for concluding that Caputo was the man who assaulted Viola Sauveur with intent to kill.

6. In Fernandez v. Phillips, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970, Mr. Justice Holmes in discussing some general principles relating to extradition said: "Form is not to be insisted upon beyond the requirements of safety and justice. Glucksman v. Henkel, 221 U.S. 508, 512, 31 S.Ct. 704, 55 L.Ed. 830. Competent evidence to establish reasonable grounds is not necessarily evidence competent to convict. See, E. G. Bingham v. Bradley, 241 U.S. 511, 517, 36 S.Ct. 634,· 60 L.Ed. 1136; Collins v. Loisel, 259 U.S. 309, 317, 42 S.Ct. 469, 66 L.Ed. 956; 1 Wigmore, Evidence (2d Ed.) § 4 (6), p. 21."

He added that there are further limits to habeas corpus: "That writ as has been said very often cannot take the place of a writ of error. It is not a means for rehearing what the magistrate already has decided. The alleged fugitive from justice has had his hearing and habeas corpus is available only to inquire whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty. Benson v. McMahon, 127 U.S. 457, 8 S.Ct. 1240, 32 L.Ed. 234; Re Luis Oteiza y Cortes, 136 U.S. 330, 10 S. Ct. 1031, 34 L.Ed. 464; Bryant v. United States, 167 U.S. 104, 105, 17 S.Ct. 744, 42 L. Ed. 94; Elias v. Ramirez, 215 U.S. 398, 406, 30 S.Ct. 131, 54 L.Ed. 253."

 Applying the above test to the record on the present writ, I must conclude that the United States Commissioner had jurisdiction in the extradition proceeding (18 U.S.C. § 651 [18 U.S.C.A. § 651]), that the offense charged is within the treaty, and that there was presented on the hear-

ing before the United States Commissioner legal and competent evidence that warranted the Commissioner in finding that there was reasonable ground to believe the accused, Jean Caputo, guilty of the crimes for which his extradition was sought. His extradition is proper and the writ of habeas corpus is accordingly dismissed.