**In the Matter of the EXTRADITION OF: Lauro Soto SALAS, Maurilio Soto Campa, Meliton Soto Campa, and Pablo Soto Campa, Defendants.**

**No. 96 M 28.**

United States District Court, N.D. Illinois, Eastern Division.

Sept. 25, 2001.

Gerardo S. Gutierrez, Chicago, IL, for Plaintiff.

Charles Ex, Assistant U.S. Attorney, Chicago, IL, for Defendant.

### EXTRADITION CERTIFICATION AND ORDER OF COMMITMENT WITHOUT BOND

ROSEMOND, United States Magistrate Judge.

On March 11, 1996, in accordance with the provisions of the May 4, 1978 Extradition Treaty in full force and effect between the United Mexican States and the United States of America, the Embassy of Mexico formally requested the provisional arrest for extradition purposes of Lauro Soto Salas, Maurilio Soto Campa, Meliton Soto Campa, and Pablo Soto Campa. A warrant of arrest and the equivalent of an American indictment were initiated in and issued by the First Criminal and Civil Trial Court of the Judicial District of Rio Grande, Zacatecas, and later said arrest warrant and said American indictment equivalent were assigned by extension of jurisdiction to the Third Criminal Court of the Judicial District of Zacatecas, Capital of the State of Zacatecas. The warrant of arrest and the American indictment equivalent charged Lauro Soto Salas, Maurilio Soto Campa, Meliton Soto Campa, and Pablo Soto Campa with the intentional aggravated homicides of four Mexican citizens. Extradition is sought for these murders.

On March 5, 1997, after an extradition hearing, this Court found Lauro Soto Salas subject to extradition and issued an "Extradition Certification and Order of Commitment Without Bond". Subsequently, Lauro Soto Salas was extradited to the Government of Mexico, where he was tried and convicted of the four murders in Za-

catecas, Mexico. More specifically, on June 29, 1998, the Third Criminal Judge of the Judicial District of Zacatecas issued a verdict of guilty, finding Lauro Soto Salas criminally responsible for the commission of the crime of homicide. Lauro Soto Salas was sentenced to 30 years in prison, and is presently confined in the Regional Social Rehabilitation Center of Ciemeguillas, Zacatecas.

In February of this year, defendant Meliton Soto Campa was arrested in Wichita, Kansas. On February 26, 2001, the "Government's Ex Parte Motion To Dismiss Complaint Without Prejudice" against defendant Meliton Soto Campa was filed.[1] The motion was granted on the same day.[2] The Government subsequently initiated extradition proceedings against Meliton in the District of Kansas.

Pablo Soto Campa remains a fugitive of Mexican justice, and has been so since March 23, 1995, the date on which the Trial Court of Family Matters, sitting in Rio Grande, Zacatecas, issued the initial arrest warrant against him charging him with the four Zacatecas murders at issue. Defendant Maurilio Soto Campa is the brother of Meliton and Pablo Soto Campa, and the first cousin of previously extradited defendant, Lauro Soto Campa.

On August 13, August 21, and September 14, 2001, pursuant to Title 18, United States Code, Section 3184, following the provisional arrest of Maurilio Soto Campa upon the formal request of the Government of Mexico, the extradition hearing in this matter was held. The Court, having considered the pleadings and written submissions of the parties; the documentary evidence introduced on behalf of the Gov-

---

1.  Docket Entry No. 46.

2.  Docket Entry No. 47.

ernment of Mexico; defendant Maurilio Soto Campa's opposition to extradition; the testimony of witnesses Jesus John Gonzalez, Gustavo Soto, Virgillo Soto, and defendant Maurilio Soto Campa; the evidence presented by both parties; and the oral arguments of counsel of record, hereby makes the following *Findings of Fact and Conclusions of Law,* and in so doing, certifies the extraditability of Maurilio Soto Campa to the Secretary of State of the United States of America on the charged offense.

## FINDINGS OF FACT

1. A valid extradition treaty exists between the United States of America and the United Mexican States. There is no challenge to the full force and effect of said treaty.

2. The extradition documents submitted by the United States of America on behalf of the United Mexican States in support of the Embassy of Mexico's request for the extradition of defendant Maurilio Soto Campa, as well as the extradition of his fugitive co-defendant and brother, *to-wit:* Pablo Soto Campa, set out the statutory bases and penalties, the underlying facts, and all necessary and related information as to the warrants of arrest obtained in and issued by the Mexican courts against these two men. No challenge to the authenticity of these documents was made.

3. The evidence admitted at Maurilio Soto Campa's extradition hearing demonstrated that the arrest warrants, as well as the other documents demanding the surrender of defendant Maurilio Soto Campa and his co-defendants were properly and legally authenticated pursuant to the terms of the Treaty and 18 U.S.C. § 3190.

No challenge to the authenticity of these documents was made.

4. The defendant Maurilio Soto Campa is in fact the same individual charged in Mexico and subject to the arrest warrant at issue. He is also the same individual who is the subject of the request for extradition. After his arrest, defendant Maurilio Soto Campa admitted to Deputy United States Marshal, Jesus John Gonzales, that he was in fact Maurilio Soto Campa, that he was the subject of the request for extradition, and that he was fully aware of the fact that he was wanted in Mexico for the Zacatecas murders:

*Government:* Did he admit to you specifically that he was Maurilio Soto Campa at that point?

*Gonzales:* Yes, he did.

*Government:* And did he indicate to you whether or not he knew whether or not he was wanted in Mexico?

*Gonzales:* He said he was aware of the fact that he was wanted.

*Government:* And did he tell you anything about why he was wanted?

*Gonzales:* He said he was wanted for murders down there.[3]

5. It should be noted that the United States Marshal Service has been searching for defendant Maurilio Soto Campa for some years. When asked by investigators of the Marshal Service about the whereabouts of Maurilio Soto Campa, members of the Soto Campa family, including his mother and his wife, all denied having any knowledge regarding his whereabouts. In this regard, the United States Marshal Service found members of the Soto Campa family to be uncooperative.[4]

6. On May 11, 2000, the Bloomingdale Police Department made a traffic stop of a

---

**3.** Transcript of the August 13, 2001 proceedings before the Magistrate Judge, at 17.

**4.** *Id.,* at 5 through 9.

1992 GMC Jimmy, a sports utility vehicle. The vehicle was registered to Arturo Soto and Cristina Campa—defendant Maurilio Soto Campa's parents.[5]

7. When Maurilio Soto Campa was arrested on May 11, 2000, he used an alias, and had on his person a false identification card, as well as, a false driver's license from the State of Kansas. The alias used by Maurilio, and the name on the false identification card was Jose Luis Figueroa Diaz.[6] Only after being shown certain family photographs of himself, did the defendant Maurilio Soto Campa recant, as noted above, and admit to the investigators that he was in fact Maurilio Soto Campa.[7]

8. The criminal charges of intentional aggravated homicide presently pending against defendant Maurilio Soto Campa and his co-defendants are violations of the Criminal Code for the State of Zacatecas, Mexico. The charges are considered crimes in both the United States and Mexico. The Treaty with Mexico expressly provides that murder is an extraditable offense.

9. The offenses for which extradition is sought are each punishable under the laws of both Mexico and the United States by imprisonment for a period of more than one year and, thus, are covered under Article 2 of the Treaty.

10. In accordance with Article 13(3) of the May 4, 1978 Extradition Treaty between the United States and Mexico, the Government of the United States provides legal representation in United States courts for the Government of Mexico in its extradition requests, and the Government of Mexico provides legal representation in its courts for extradition requests made by the United States. At the extradition hearing herein, the Government of the United States introduced evidence on behalf of Mexico. The evidence presented at the hearing shows that all of the requirements of the extradition treaty between the United States and Mexico have been met. No challenge to the authenticity of these documents was made.

11. The criminal charges and warrants of arrest are predicated on the declarations, accusations, and statements of eyewitnesses to the crimes charged, together, in some instances, with corroborating physical evidence, as well as other credible and persuasive evidence presented at the hearing. No challenge to the authenticity of these documents was made.

12. On the morning of March 20, 1995, in the village of Villa Cardenas, belonging to the municipality of General Francisco R. Murguia, of the Government of the free and sovereign State of Zacatecas, of the United Mexican States, four men, namely, Juan Manuel Ortega Mares, Jose Vicente Ortega Rangel, Arnulfo Ortega Mares, and Maurilio Mares Aguero were shot and killed in three different locations in and around Villa Cardenas.

13. Defendant Maurilio Soto Campa is the brother to co-defendants Meliton Soto Campa and Pablo Soto Campa. He is first cousin to co-defendant Lauro Soto Salas. Prior to the date of the four murders, all of the co-defendants resided in Chicago. First cousin Lauro Soto Salas, having been tried, convicted, and sentenced by the Mexican courts for the four murders at issue, is now an inmate in the Penitentiary of Cieneguillas, Zacatecas.

5. *Id.,* at 10 and 11.

6. Transcript of the August 13, 2001 proceedings before the Magistrate Judge, at 13 and 14.

7. *Id.,* at 16.

14. As noted earlier, the parents of brothers Maurilio Soto Campa, Meliton Soto Campa, and Pablo Soto Campa are Arturo Soto and Cristina Campa. They reside in Chicago. The three brothers and first cousin Lauro Soto Campa all share the same paternal grandparents, and all four were born in Villa Cardenas, in Zacatecas, Mexico.

15. Maurilio Soto Campa left Mexico in 1984, when he was 13 years old. He has returned only twice. The last time that he was in Mexico was to bury his brother in 1995. He was in Mexico then for about a week to 10 days.

16. Maurilio Soto Campa's brother, Mario Soto Campa, was murdered in Villa Cardenas, Zacatecas, Mexico, on March 2, 1995. Maurilio, Pablo, and Meliton Soto Campa, and their first cousin, Lauro Soto Campa, all attended Mario's funeral in Villa Cardenas in March of 1995.

17. Maurilio Soto Campa was absent from his place of employment in the Chicago area between March 18, 1995 and April 16, 1995.

18. Pablo Soto Campa quit his job in the Chicago area on March 3, 1995. Pablo told his employer that he was quitting to go to Mexico. Pablo returned to work and was rehired on December 11, 1995.

19. Meliton Soto Campa was absent from his place of employment in the Chicago area for about three months, beginning in early March of 1995. Meliton told his employer that he had to go to Mexico because his brother had been murdered there.

20. The murders of Juan Manuel Ortega Mares, Jose Vicente Ortega Rangel, Arnulfo Ortega Mares, and Maurilio Mares Aguero occurred on March 20, 1995 in and around certain locations in Villa Cardenas, in Zacatecas. In February of 1996, defendant Maurilio Soto Campa's brother, Gustavo Soto, told Deputy United States Marshal Jesus Gonzales that Maurilio and his other two brothers, Pablo and Meliton, and his cousin, Lauro Soto Salas, all went to Mexico to avenge the murder of their brother Mario Soto Campa. At the August 21st, 2001 extradition hearing, Gustavo, 24 years old with only a first year of high school education, denied ever making the aforesaid statement to Deputy Marshal Gonzales. However, Gustavo was not a credible witness. For one thing, he denied that his brothers ever went to his murdered brother's funeral. At the September 14th, 2001 reopening and continuation of his extradition hearing, Maurilio Soto Campa, himself, admitted that he had gone to Mexico to bury his brother. In addition, Virgillo Soto, the older brother of Maurilio, Pablo, Meliton, and Gustavo, similarly testified at the August 21st extradition hearing that Maurilio was in attendance at his murdered brother's funeral:

*Government:* And you say he [Mario Soto Campa] was killed in Villa Cardenas, Mexico, is that correct?

*Virgillo S:* Yes.

*Government:* Do you remember what year . . .

*Virgillo S:* It was in '95.

*Government:* Do you remember what month in '95?

*Virgillo S:* March 2.

*Government:* And were you able to attend his funeral?

*Virgillo S:* Yes.

*Government:* Do you recall if your brother Maurilio Soto was at the funeral as well?

*Virgillo S:* Yes.

*Government:* And how old was Gustavo at the time?

*Virgillo S:* About 18 years old.

*Government:* And was he there at the funeral as well?

*Virgillo S:* No.[8]

It was apparent at the evidentiary hearing that Gustavo was endeavoring to be protective of his brothers by denying anything and everything that would put his brothers in Mexico in March of 1995. Accordingly, to the extent that any of our *Findings of Fact* differ from the testimony of witness Gustavo Soto, we choose not to credit his testimony.

21. J. Cruz Cordoba Garcia, an eyewitness to the murder of Juan Manuel Ortega Mares, gave a statement identifying two individuals who he knew to be the sons of Arturo Soto, who currently lived in the United States but formerly lived in Villa Cardenas, as shooting and killing Juan Manuel Ortega Mares at his home on the morning of March 20, 1995. Cordoba Garcia was helping Ortega Mares with some bricklaying work at the victim's house at the time of the murder.

22. Refugio Mares Chairez, an eyewitness to the murder of Jose Vicente Ortega Rangel, also identified the murders as the sons of Arturo Soto and Cristina Campa, who currently live in the United States but formerly lived in Villa Cardenas. The murderers shot and killed Jose Vicente Ortega Rangel at his home at around 10 or 10:30 a.m. on March 20, 1995. Chairez was working at Ortega Rangel's home at the time of the murder.

23. According to the statement of Maria De La Luz Gonzalez Mendoza, the wife of victim Jose Vicente Ortega Rangel, she was inside her home when she suddenly heard some shots. She ran outside to her husband and saw Lauro Soto Salas and Pablo Soto Campa carrying guns and climbing in a red and black pick-up truck, which then drove away. She could not identify the driver of the truck. She later identified Lauro Soto Salas from photographs, including a photograph provided by the United States Marshal Service.

24. Jesus Ortega Castaneda, an eyewitness to the murders of Arnulfo Ortega Mares and Maurilio Mares Aguero also gave a statement on March 20, 1995. Ortega Castaneda was a farmer working in a field outside of Villa Cardenas with his sons, Amauri and Arnulfo Ortega Mares, and a third individual, Maurilio Mares Aguero. At about 10:30 a.m., Lauro Soto Salas, Maurilio Soto Campa, Meliton Soto Campa and Pablo Soto Campa drove up to the field in a fenced cattle truck with red stripes. Maurilio Soto Campa and his three companions began shooting at them from the truck, killing his son Arnulfo and the other individual present, Maurilio Mares Aguero. The killers then drove away in the truck. Ortega Castaneda recognized Maurilio Soto Campa, having known Maurilio and the Soto Campa brothers since they were very young.

25. Amauri Ortega Mares, another eyewitness to the murders of Arnulfo Ortega Mares and Maurilio Mares Aguero, described how he, his father, his brother, and Mares Aguero were branding a calf when Lauro Soto Salas, Maurilio Soto Campa, Meliton Soto Campa and Pablo Soto Campa drove up to the field in a fenced pick-up truck with red stripes. Maurilio Soto Campa, his cousin, and his two brothers shot at them and killed Arnulfo Ortega Mares and Maurilio Mares Aguero. Amauri Ortega Mares has known Maurilio Soto Campa since childhood. Maurilio is married to Amauri's cousin, Socorro Perez Mares.

26. Another witness, Felipe Rojas Gomez, was in his yard in Villa Cardenas on

---

**8.** Transcript of the August 21, 2001 extradition proceedings before the Magistrate Judge, at 101 and 102.

the morning of March 20, 1995. At about 10:30 or 11:00 a.m., he saw a red-fenced cattle truck traveling near the fields where Arnulfo Ortega Mares and Maurilion Mares Aguero were murdered. Rojas Gomez had heard approximately seven gunshots from the fields five minutes before seeing the truck drive by.

27. Bullets and bullet casings from approximately seven different murder weapons were found in the body of one of the victims, and recovered from the crime scenes, and the truck driven by the murderers. The truck was owned by Mario Soto Campa, the deceased brother of Maurilio Soto Campa.

28. None of the four victims had fired any firearms prior to being murdered.

29. Edith Ortega Gonzales identified a United States Marshal Service photograph of Maurilio Soto Campa as one of the killers of her father, Jose Vincente Ortega Rangel. Edith has known Maurilio since they were young.

30. A Mexican identification expert, Mr. Ismael Hernandez Montero, compared the United States Marshal Service photograph of Maurilion Soto Campa to a known photograph of Maurilio Soto Campa, provided by the Mexican government. Using the *"Alphonse Bertillian Identification System"*, which analyses characteristics of the face, the expert concluded that the two photographs are of one and the same person.

31. The Court finds the witnesses and evidence presented on behalf of the Government of Mexico, including the testimony of Deputy United States Marshal Jesus Gonzales and defense witness Virgillo Soto, to be credible and competent. The eyewitnesses who inculpated the defendant Maurilio Soto Campa were most familiar with the Soto Campa family, and had known Maurilio, his brothers, and his cousin since childhood. Indeed, defendant Maurilio Soto Campa, himself, admits that in Villa Cardenas *"most everybody knows everybody else in th[e] village."*[9] Thus, the Government of Mexico's request for extradition is not dependent on eyewitness identification of persons to whom Maurilio Soto Campa and his family are strangers.

32. Defendant Maurilio Soto Campa's own conduct is suggestive of guilt. For the past five years, since his return from burying his murdered brother in Mexico, Maurilio has not lived openly and notoriously as Maurilio Soto Campa. Instead, he has used and lived under the alias of Jose Luis Figueroa Diaz. He has also used false identification papers and a false driver's license in the same name. His parents and his wife profess to know nothing of his whereabouts—yet he uses and drives a sports utility vehicle registered in the name of his parents. All these facts permit an inference of guilt supporting a finding of probable cause:

> *That [extradition detainee] concealed his identity and moved to a different address in Chicago permits an inference of his guilt. Flight also is a legitimate ground from which to infer guilt …*[10]

33. As noted earlier, by his own words, the defendant Maurilio Soto Campa, admits that he is in fact the same individual charged in the Arrest Warrant and the subject of the request for extradition by Mexico. Thus, this is not a question of mistaken identity.

---

9. Transcript of the September 14, 2001 proceedings before the Magistrate Judge, at 146 (emphasis added).

10. *Eain v. Wilkes,* 641 F.2d 504, 511 (7th Cir.1981) (emphasis added).

**34.** To the extent that these *Findings of Fact* vary from the testimony of witnesses Gustavo Soto and Maurilio Soto Campa, then we choose not to credit their testimony.

**35.** None of the evidence submitted by defendant Maurilio Soto Campa negated the Government of Mexico's showing of probable cause.

## CONCLUSIONS OF LAW

**1.** Any of the foregoing Findings of Fact which may be deemed a Conclusion of Law is hereby adopted as a Conclusion of Law. Any of the following Conclusions of Law which may be deemed a Finding of Fact is hereby adopted as a Finding of Fact.

**2.** The Magistrate Judge has jurisdiction of the parties and the cause.

**3.** The Magistrate Judge is authorized by law to conduct extradition proceedings.

■ **4.** An extradition hearing is not a criminal proceeding, and the person whose return is sought is not entitled to the rights available in a criminal trial at common law.[11]

**5.** Pursuant to the Formal Request of International Extradition made by the Government of the United Mexican States to the Government of the United States of America, through Diplomatic Note 0392, dated March 11, 1996, the extradition proceedings herein were initiated by the United States of America on behalf of the United Mexican States in accordance with Title 18, United States Code, Section 3184.

**6.** No identity hearing was requested or held in these extradition proceedings, because defendant Maurilio Soto Campa does not deny that he is in fact Maurilio

Soto Campa. Accordingly, it is undisputed that the defendant is Maurilio Soto Campa. And, as the record has demonstrated, defendant Maurilio Soto Campa is one and the same person as the Maurilio Soto Campa who is the subject of the Mexican arrest warrant and the Mexican extradition request.

■ **7.** In an extradition hearing, the only inquiries which the extraditing court may make are the following:

(a) whether there is an applicable extradition treaty between the requesting and requested countries which is in full force and effect;

(b) whether charges are pending against the person to be extradited in the requesting nation;

(c) whether the treaty authorizes extradition for the crimes alleged to have been committed;

(d) whether there is probable cause to believe that a crime was committed and that the person to be extradited committed it.

As noted hereinafter, these concerns have been satisfied by the Government of Mexico.

**8.** *An existing treaty:* The May 4, 1978 Extradition Treaty between the United States of America and the United Mexican States, 31 UST 5059, TIAS 9656, has at all relevant times, including the present, been in full force and effect.

**9.** *Pending charges:* The crimes of intentional aggravated homicide with which the defendant Maurilio Soto Campa is charged by the Mexican authorities are among the offenses enumerated in Article 2, Paragraph 1 (and Appendix, Paragraph 1, thereto) of the May 4, 1978 Extradition

---

**11.** *In the Matter of the Extradition of Angela Christine Powell,* 4 F.Supp.2d 945, 951 (S.D.Cal.1998).

Treaty between the United States of America and the United Mexican States, 31 UST 5059, TIAS 9656, and remain pending in the Mexican courts.

■ 10. **Dual criminality:** An offense is extraditable only if the acts charged are criminal under the laws of both countries concerned. Article 2, Paragraph 1 of the Extradition Treaty between the United States and Mexico, makes dual criminality a requirement. The facts upon which the Mexican charges of intentional aggravated homicide are based are proscribed, as felonies, by similar provisions of federal law and the law of the State of Illinois. The criminal charges of intentional aggravated homicide are violations of the Criminal Code for the State of Zacatecas, Mexico, as well as violations of United States and Illinois law.[12] Additionally, pursuant to Article 2, Paragraph 1 of the Treaty, the offense must be punishable by at least one year in prison. Intentional aggravated homicide, under Mexican law, provides for punishment of over one year imprisonment.[13] Illinois murder statutes, *to-wit:* Chapter 720, Illinois Compiled Statutes, Section 5/9–1 and Chapter 730, Illinois Compiled Statutes, Section 5/5–8–1(a)(1), each provide for imprisonment of over one year. The Federal Murder Statute, *to-wit:* Title 18, United States Code, Section 1111(a), also provides for imprisonment of over one year.

11. One purpose of the extradition hearing held in this cause was to examine, whether or not, the evidence submitted, met the criteria for extradition to Mexico set forth in the extradition treaty between the United States of America and the United Mexican States. We conclude that it did.

■ 12. A Magistrate Judge's function in an extradition hearing is to determine whether there is any evidence establishing reasonable or probable cause. Before an accused can be certified for extradition, a Magistrate Judge must find probable cause, under federal law, that the accused committed the offense with which he is charged by the requesting sovereign. Probable cause is the level of evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of an accused's guilt. Stated another way, probable cause is the existence of a reasonable ground to believe an accused guilty.

■ 13. A Magistrate Judge has no discretion whether to extradite. If the Magistrate Judge deems the evidence sufficient to establish probable cause, then the Magistrate must certify for extradition.

■ 14. It is well settled that defenses are irrelevant to extradition hearings and should therefore not be considered.[14] Affirmative defenses are best left to the jurisdiction of the courts of the demanding nation.

■ 15. **Probable cause:** As noted above, in an extradition hearing, a Magistrate Judge is called upon to determine whether there is competent evidence to justify holding the accused to await trial in a foreign country. We conclude that the evidence presented on behalf of the Government of Mexico was competent and suf-

---

12. *See,* the Federal Murder Statute of Title 18, United States Code, Section 1111(a); and, the Illinois Murder Statutes of Chapter 720, Illinois Compiled Statutes, Section 5/9–1 and Chapter 730, Illinois Compiled Statutes, Section 5/5–89–1(a)(1).

13. *See,* Annex M: Articles 293–299 to Zacatecas, Mexico Criminal Code.

14. *Charlton v. Kelly,* 229 U.S. 447, 462, 33 S.Ct. 945, 57 L.Ed. 1274 (1913); *Collins v. Loisel,* 259 U.S. 309, 42 S.Ct. 469, 66 L.Ed. 956 (1922).

ficient for that purpose, and further that it was sufficient to establish probable cause.

16. The evidence presented has established probable cause to sustain the charges for which the Embassy of Mexico seeks extradition under the provisions of Article 2, Paragraph 1 (and Appendix, Paragraph 1, thereto) of the May 4, 1978 Extradition Treaty between the United States of America and the United Mexican States, 31 UST 5059, TIAS 9656. In particular, as described earlier, multiple eyewitnesses saw Maurilio Soto Campa, his two brothers and his cousin, shoot and kill Juan Manuel Ortega Mares, Jose Vicente Ortega Rangel, Arnulfo Ortega Mares, and Maurilio Mares Aguero on March 20, 1995. Witnesses have specifically identified Maurilio Soto Campa, including identifying him in photographs, as participating in the murders. Independent witness statements from numerous individuals reciting similar facts all corroborate each other, and lend credence to each.

17. In an extradition proceeding, a determination of probable cause may rest entirely upon hearsay.[15]

18. No evidence offered by the defendant Maurilio Soto Campa in any way negates a finding of probable cause that the defendant actively participated in the four murders charged in the Mexican Arrest Warrant.

19. The function of the Magistrate Judge in an extradition hearing is not to conduct an inquiry into the validity or the motivations behind the issuance of the arrest warrant against defendant Maurilio Soto Campa, but rather to compare evidence submitted in support of his extradition to the requirements of the extradition treaty. If the treaty requirements are met, and probable cause found, the Magistrate Judge must certify to the Secretary of State that the accused is extraditable. By this *Order* we do so.

20. Defendant Maurilio Soto Campa is properly extraditable to Mexico.

21. By letter dated August 17, 2001, the defendant Maurilio Soto Campa wrote the following letter to the Court:

Dear: Judge Rosemond

I am writing you this letter concerning my extradition to Mexico. My biggest concern (fear), of being extradited is that my life would be in great danger. The people that I am accused of committing the crime against are people with very strong political influence in the State government of Zacateccas, Mexico. Therefore my life would be at great risk if I am extradited back to Zacateccas, Mexico, based on these individuals political influence. The mere fact that the son and daughter of one of my alleged victims work for the government of Zacateccas, in the position of that which is equivalent to that of a senator. Knowing the corruption thats in the government of Zacateccas, as well as Mexico, I know that there is no way for me to obtain a fair trial. At present I have attorneys in Mexico, trying to get my case moved to a different jurisdiction within Mexico, with the hope of receiving a fair trial if it is possible. So I am praying that you will grant me my request to stay here until I am informed about the decision made on the relocation of my case to Mexico City, because if I am extradited back to Zacateccas, my life would be in great danger for something that I did not do. *I am*

15. *In re Ryan,* 360 F.Supp. 270, 273 (E.D.N.Y. 1973); and, *United States v. Marasco,* 275 F.Supp. 492, 494 and 495 (S.D.N.Y.1967).

*willing to elaborate more about my situation in court.*

Thank you for your consideration.

Thank You, Sincerely

/s/ *Maurilio Soto Campo*[16]

On September 14, 2001, the extradition hearing was reopened and continued to permit the defendant Maurilio Soto Campa the opportunity *"to elaborate more about [his] situation."* He failed to do so.

22. At the September 14th hearing, Maurilio Soto Campa conclusorily testified that he feared for his life if he was returned to Mexico. However, he gave no details in support of his claims of fear. His murdered brother, Mario Soto Campa, was a Judge in Villa Cardenas. The defendant makes no suggestion that his brother's murder was part of any violent political disturbance or movement. Indeed, Maurilio identified no individuals, no feuding family, no segment of the population, no political party, no political movement which would want him or his family dead. He identified no link or connection to the offense for which he is accused and his fear for his life should he be returned to Mexico.

Although in the course of his testimony on the witness stand the defendant referred to the Ortega family and identified them as "powerful politicians," he articulated no reason whatsoever regarding why they would want him dead. Perhaps, it can be presumed that some members of the Ortega family want the defendant dead because some of them accuse him of having murdered members of their family. Even so, the defendant does not consider the Ortega family to be his enemy:

*The Court:* Why are the Ortegas his enemies?

*Maurilio:* They are not my enemies. I don't know if they murdered my brother. But they are the ones who are accusing me of doing it.[17]

More importantly, the defendant concedes that he has received no specific threat to his life from anyone, including the Ortega family:

*Government:* Has anybody that is living in Zacatecas, Mexico ... has anybody from that province of Mexico directly made any threat to your life?

*Maurilio: I haven't been threatened because I haven't seen anyone.*[18]

23. No evidence was proffered showing that his co-defendant and cousin, Lauro Soto Salas, who was extradited to Mexico over three years ago suffered any severe bodily harm or death. Indeed, the evidence is to the contrary. Lauro Soto Salas is alive and presently serving a 30–year sentence in the Penitentiary of Cieneguillas, Zacatecas.

24. Maurilio Soto Campa testified that his father and mother, Arturo Soto and Cristina Campa, returned to the village of Villa Cardenas for vacations, and that they have done so more than once. If the family was afraid for their lives, they would not have returned to Mexico on more than one occasion. Maurilio and his brothers returned to the village of their birth to bury their murdered brother, and did not suffer severe bodily harm or death.

25. We conclude that the fear espoused by Maurilio Soto Campa has no substance nor factual basis. Indeed, the "fear" appears to be nothing more than an eleventh hour afterthought to avoid extradition to

---

16. Docket Entry No. 53 (emphasis added).

17. Transcript of the September 14, 2001 proceedings before the Magistrate Judge, at 150.

18. Transcript of the September 14, 2001 proceedings before the Magistrate Judge, at 148 (emphasis added).

Mexico or, at the very least, an effort to secure additional time within which his Mexican lawyers can pursue and obtain a change of venue for his criminal trial in Mexico on the charges at issue. No credible explanation to the contrary is proffered by the defendant for this last-minute endeavor on his part. In any event, the defendant Maurilio Soto Campa has failed to present any valid defense to his extradition to Mexico.

26. The concerns of the defendant Maurilio Soto Campa, as expressed in his August 17th letter to the Court, were explored in an evidentiary hearing at the request of Soto Campa counsel for two purposes, *to-wit: First,* to give the defendant an opportunity to make an offer of proof with respect to the matter, an opportunity which the Government opposed on jurisdictional grounds; and, *Second,* for purposes of obtaining a recommendation from the Magistrate Judge to the Secretary of State to the effect that the Secretary honor the defendant's requests.

██ 27. The prevailing case law is to the effect that an extradition detainee's claim that he will be mistreated, denied a fair trial, deprived of his constitutional and human rights, or even deprived of his life if returned to the requesting sovereign is not a proper matter for consideration by the certifying Magistrate Judge. It is the function of the Secretary of State to determine whether extradition should be denied on humanitarian grounds. The record herein poses no challenge to the wisdom of that decisional law.

28. At the conclusion of the September 14th evidentiary hearing on defendant Maurilio Soto Campa's August 17th letter to the Court, Soto Campa counsel sought and obtained leave of court to file a memo-

randum of law on the issues raised by the letter. On September 21st, 2001, instead of filing a brief relating to the issues raised by Soto Campa's August 17th letter, the defendant filed a *"Reply To Government's Proposed Findings Of Facts And Statement Of Law "* raising jurisdictional issues. In his memorandum of law, the defendant asserts that the "reciprocal extradition treaty with the government of Mexico" only satisfies ... one element of either the *Ornelas* test (*Ornelas v. Ruiz,* 161 U.S. 502, 16 S.Ct. 689, 40 L.Ed. 787 (1896)) or the *Barr* test (*United States v. Barr,* 619 F.Supp. 1068, 1070 (E.D.Pa.1985)).[19] We disagree.

29. *Ornelas* was concerned with the scope of inquiry on a writ of habeas corpus, *to-wit:*

> the court issuing the writ may "inquire and adjudge whether the commissioner acquired jurisdiction of the matter, by conforming to the requirements of the treaty and the statute; whether he exceeded his jurisdiction; and whether he had any legal or competent evidence of facts before him, on which to exercise a judgment as to the criminality of the accused. But such court is not to inquire whether the legal evidence of facts before the commissioner was sufficient or insufficient to warrant his conclusion." [20]

Continuing in this vein, the *Ornelas* court ruled as follows:

> By repeated decisions of this court it is settled that a writ of habeas corpus cannot perform the office of a writ of error, and that, in extradition proceeding, if the committing magistrate has jurisdiction of the subject-matter and of the accused, and the offense charged is within the terms of the treaty of extradition,

---

**19.** *"Reply To Government's Proposed Findings Of Facts And Statement Of Law "*, at 1.

**20.** *Ornelas v. Ruiz,* 161 U.S. 502, 508, 16 S.Ct. 689, 691, 40 L.Ed. 787 (1896).

and the magistrate, in arriving at a decision to hold the accused, has before him competent legal evidence on which to exercise his judgment as to whether the facts are sufficient to establish the criminality of the accused for the purposes of extradition, such decision cannot be reviewed on habeas corpus.[21]

At the outset, we note that the appropriate scope of inquiry for a writ of habeas corpus is not at issue in these proceedings.

■ In any event, in the United States, extradition is governed by the federal extradition statute.[22] Section 3184 of Title 18, United States Code, confers jurisdiction on federal courts to hold extradition proceedings:

Thus, federal courts have jurisdiction over extradition complaints only when a valid treaty exists between the United States and the government of the foreign country where the alleged offense occurred.[23]

Section 3184 of the statute mandates that the extradition be based on a treaty or convention, with some exceptions not at issue in this proceedings.[24] Thus, whether the Magistrate Judge has **subject matter** jurisdiction to certify defendant Maurilio Soto Campa's extradiability depends on whether there is a "treaty" between the United States of America and the United Mexican States. It is undisputed that there is, and it is undisputed that it is valid and in full force and effect.

**30.** Defendant Maurilio Soto Campa does not challenge the subject matter jurisdiction of the Magistrate Judge. Nor

does he dispute that the offense charged is within the terms of the treaty of extradition. The defendant charges that the government of Mexico has not "satisfied the personal jurisdictional requirement".[25]

**31.** Citing broad, abstract and well-settled principles of law will not carry the day for the defendant. The fact remains that he has cited no decisional law nor provided any cogent analysis to support his "no personal jurisdiction" challenge. It is undisputed that arrest warrants for his apprehension were issued by courts of the United Mexican States, that the defendant was found in the State of Illinois, that his Kansas identification papers and driver's license are false, and that upon his arrest he appeared before a United States Magistrate Judge of the United States District Court for the Northern District of Illinois, which jurisdiction encompasses the location where he was found and arrested. The defendant offers no support for his contention that these facts are insufficient to establish personal jurisdiction.

**32.** It is undisputed that the situs of the homicides at issue are three different locations in and around the village of Villa Cardenas, belonging to the municipality of General Francisco R. Murquia, of the Government of the free and sovereign State of Zacatecas, of the United Mexican States. Defendant Maurilio Soto Campa is a fugitive from Mexican justice. A fugitive is an individual "who is charged with having committed a crime punishable under the laws of the demanding state, but who is not to be found in that territory after allegedly committing the crime."[26] Mexi-

---

**21.** *Ornelas,* 161 U.S. at 508, 509, 16 S.Ct. at 691.

**22.** *See,* 18 U.S.C. §§ 3181–3196.

**23.** *Cheung v. United States,* 213 F.3d 82, 90 (2d Cir.2000). *See also,* 213 F.3d at 89.

**24.** *Cheung,* 213 F.3d, at 87 and 88.

**25.** *"Reply To Government's Proposed Findings Of Facts And Statement Of Law",* at 2.

**26.** *United States v. Marasco,* 275 F.Supp. 492, 496 (S.D.N.Y.1967).

co is the demanding sovereign. Murder is a crime punishable under its laws. The defendant Maurilio Soto Campa was not to be found within its borders after the murders were committed. The defendant was found within the jurisdiction of the United States District Court for the Northern District of Illinois. The defendant was neither found in nor arrested in the State of Kansas. Contrary to the defendant's assertions, there is no evidence in the record that the defendant resides in or ever resided in the State of Kansas. Forged or false documents are not credible evidence of residence.

33. The sole object of the extradition proceeding was the arrest and forcible return of the defendant Maurilio Soto Campa to Mexico in compliance with American treaty obligations.[27] Defendant Maurilio Soto Campa is an individual officially charged by judicial authorities in the requesting sovereign of the United Mexican States. As noted above, pursuant to 18 U.S.C. § 3184, "the requested person may be arrested and held in custody once he is found within the jurisdiction of the Court to which application is made by complaint under oath."[28] Article 11 of the May 4, 1978 *"Extradition Treaty Between The United States Of America And The United Mexican States"* expressly provides for the provisional arrest of an accused, such as, the defendant. Accordingly, the defendant's "lack of personal jurisdiction" challenge is wholly without merit.

34. During the course of the extradition proceeding, defendant Maurilio Soto Campa objected to various of the Mexican witnesses' identifications of his photograph taken by the United States Marshal Service and provided to Mexican authorities by the United States government. Defen-

dant moved to strike the identification as "impermissible" and to dismiss the extradition warrant based on "impermissive showing and identification" of only one United States Marshal Service photograph of defendant to Mexican witnesses as opposed to an entire photo line-up. Defendant's objection is baseless.

35. During the extradition hearing, the United States stipulated that the United States Department of Justice, Office of International Affairs, provided a copy of defendant's United States Marshal Service booking photographs to the Mexican government, who in turn showed the photos to various Mexican witnesses, who were able to identify the person as defendant Maurilio Soto Campa. The record fully supports that these identifications were not improper or unfairly suggestive.

36. The Mexican witnesses' photo identifications were reliable. As noted earlier, this is not a situation where witnesses identified a previously unknown offender. To the contrary, the witnesses had all known Maurilio Soto Campa and his family since he was a youth, as he was born in Villa Cardenas, the Mexican village where the murders occurred, and grew up there prior to moving to the United States. Obtaining verification from witnesses by showing them photograph of the person known previously to them is not improperly suggestive or unreliable and, in this case, could not have resulted in any misidentification of defendant. This is particularly so since the Mexican witnesses to the murders previously identified defendant Maurilio Soto Campa before viewing the United States Marshal Service booking photographs in question. Accordingly, the identification of defendant by the Mexican

---

27. *See, In the Matter of the Extradition of Francesco Pazienza,* 619 F.Supp. 611, 616 (S.D.N.Y.1985).

28. *Pazienza,* 619 F.Supp. at 616.

**930**

witnesses who viewed his United States Marshal Service photograph is proper.

37. Defendant's motion to strike the photo identification of defendant by witnesses from Mexico, and related motion to dismiss extradition proceeding on the grounds of allegedly unduly suggestive identifications of defendant are hereby denied.

*Accordingly, it is hereby adjudged, decreed, and ordered as follows:*

1. This matter is hereby certified to the Secretary of State.

2. This Certificate of Extraditability and Order of Commitment, together with all formal extradition documents received in evidence, together with a certified copy of all testimony and evidence taken at hearings and all memoranda of law filed on the issue of extradition, and all orders of court, shall hereby be forwarded to the Secretary of State by the Clerk of the United States District Court for the Northern District of Illinois so that a warrant may issue upon the requisition of the proper authorities of the United Mexican States for the surrender of defendant Maurilio Soto Campa according to the provisions of the Extradition Treaty between the United States of America and the United Mexican States, dated May 4, 1978, 31 UST 5059, TIAS 9656.

3. Defendant Maurilio Soto Campa be and the same hereby is committed to the custody of the United States Marshal pending his surrender to the United Mexican States, or until further order of court.

*So Ordered.*