Thomas James MARTIN, Petitioner–Appellant,

v.

WARDEN, ATLANTA PEN, U.S. Marshall Service, Respondents–Appellees.

No. 92–8955.

United States Court of Appeals, Eleventh Circuit.

June 21, 1993.

Bruce Maloy, Maloy & Jenkins, R. Keegan Federal, Jr., Julie A. Goodwin, Atlanta, GA, for petitioner-appellant.

Richard M. Langway, Asst. U.S. Atty., Atlanta, GA, for respondents-appellees.

Before BLACK and CARNES, Circuit Judges, and RONEY, Senior Circuit Judge.

BLACK, Circuit Judge:

This appeal requires us to determine whether an American citizen accused of committing a crime in another nation has a due process right under the United States Constitution to a "speedy extradition." Appellant Thomas James Martin contends that Canada's alleged delay of over seventeen years in seeking his extradition on charges of criminal negligence causing death and leaving the scene of an accident violates his right to due process under the Fifth Amendment. The district court found that Canada's actions did not violate Martin's due process rights. Because we hold there is no due process right to a speedy extradition, we affirm.

## I. BACKGROUND

In 1969, Thomas James Martin fled the United States with his wife to avoid the Vietnam draft. He was routinely indicted for draft evasion in his home state, Kentucky.

Under the extradition treaty then in force between the United States and Canada, Martin could not be extradited to the United States.

Five years later, the United States announced an amnesty program for draft resisters. Martin applied to participate. He was instructed to return to the United States in January 1975.

On December 13, 1974, however, Martin was involved in a tragic accident in Hamilton, Ontario. Martin was driving home in a two-seat Triumph convertible when two seven-year-old girls and a seven-year-old boy, playing follow the leader, crossed in front of him. Martin struck and killed the boy, Joey Bellanie.

Martin gave the following version of events in a television interview with a Canadian reporter in February 1975.

It was about 6:30 p.m. and it was dark and I was on my way home, a routine route I took every night. As I approached the intersection ... I ·had a green light.... [T]hree quarters of the way through the intersection I saw a blur in front of my car and I saw two distinct figures, very small figures, and as I went into the left lane to go around the figures, I heard a thud on my car, I immediately stopped, slammed on the brakes ... got out of my car and looked around the car. By this time, two children ... were standing across the street and seemed quite upset. At that time I raised my hand in a gesture to ask what had happened, and there was no answer. Again, I looked around the car and saw fruit juice cans smashed on the ground. Once again, only this time I raised both hands, I guess I was getting very emotional ... I asked please tell me what did I hit. Again there was no answer.... I just ... thanked God, and got back in my car, and drove away and went home.

The two girls and other eyewitnesses, however, said they could see Joey Bellanie lying prone beneath the car. They screamed that Bellanie was trapped. Because they could

hear Martin, they believed he could hear them. One eyewitness said he heard Bellanie's coat scrape along the pavement when Martin drove away, dragging Bellanie approximately six hundred feet. After Bellanie's body separated from the undercarriage of Martin's Triumph, it was struck by a second car.

According to Martin:

It wasn't until later at home on the TV news that [I heard] there was a hit-skip accident at that particular intersection and that a seven-year-old boy had been killed and that they were looking for a car of the description of mine. And it was at that time that I put two and two together and decided it must have been me. I must have, in fact, done that horrible thing.... I phoned a lawyer immediately to find out just what I should do.... It was at that time that he told me, he advised me, it was not his habit or his convention to advise people how to evade the law, but in that particular case he felt that it was such an emergency circumstance that I grab my family and proceed immediately to the United States.

Although he habitually commuted in his Triumph, Martin drove a different car to work on Monday, December 16. He told his employer he was returning to the United States to attend to a family medical emergency. That evening, he purchased a plane ticket. The following day he flew back to the United States with his wife and five-year-old son. He never returned to Canada.

Canadian authorities charged Martin on December 19 with criminal negligence causing death and leaving the scene of an accident.[1] A warrant was issued for Martin's arrest. Canadian police later conducted tests with Martin's Triumph—abandoned in Canada when he fled—and a sixty-pound sand bag that led them to conclude that Martin must have realized that he struck Joey Bellanie and dragged the boy for a substantial distance.

1. According to the government, under Canadian law the maximum sentence for criminal negli-

gence causing death is life imprisonment.

The extradition treaty then in effect between the United States and Canada provided for the extradition of persons who committed crimes listed in an attached schedule. Extradition Treaty, Dec. 3, 1971, U.S.–Can., art. 2, 27 U.S.T. 985 (Extradition Treaty). "Murder," "assault with intent to commit murder," "manslaughter," and "wounding, maiming, or assault occasioning bodily injury" were listed as extraditable offenses. "Criminal negligence causing death" and "leaving the scene of an accident" were not specifically listed.

The United States Department of Justice initially refused to permit Martin to participate in the amnesty program for draft evaders because of the pending criminal charges in Canada. Martin hired a lawyer who urged the Department of Justice to reconsider, arguing that the offense Martin was charged with was not subject to extradition.[2] Martin was subsequently admitted to the amnesty program. After he completed two years of community service, the draft evasion indictment against Martin was dismissed.

A protocol amending the extradition treaty between the United States and Canada was negotiated in 1988, and entered into effect on November 26, 1991. Protocol Amending the Extradition Treaty, Jan. 11, 1988, U.S.–Can., 27 I.L.M. 423 (Protocol). The schedule of extraditable crimes was deleted. As amended, the treaty permits extradition "for conduct which constitutes an offense punishable under the laws of both Contracting Parties by imprisonment ... exceeding one year." Extradition Treaty at art. 2. The treaty applies to crimes committed before the effective date as well as crimes committed later. Protocol at art. VIII.

2. Martin's lawyers now argue that the definition of "manslaughter" under Canadian law encompassed "criminal negligence causing death." They argue that Canada could have sought Martin's extradition as early as 1974 rather than waiting until the treaty was amended in 1991. We need not resolve this issue.

3. There is no direct appeal in extradition proceedings. *Hill v. United States*, 737 F.2d 950, 951 (11th Cir.1984); *see also Koskotas v. Roche*, 931 F.2d 169, 171 (1st Cir.1991); *Ahmad v. Wigen*, 910 F.2d 1063, 1065 (2d Cir.1990); *In re Extradition of Kraiselburd*, 786 F.2d 1395, 1396 (9th Cir.), *cert. denied*, 479 U.S. 990, 107 S.Ct. 586, 93 L.Ed.2d 588 (1986); *In re Extradition of*

In June 1992, the Canadian embassy in Washington submitted a diplomatic note to the Department of State requesting that Martin be extradited pursuant to the amended treaty. Martin was arrested and detained in July.

■ At separate hearings in July and August 1992, a magistrate judge determined that Martin was not eligible for bail and was extraditable. Martin filed a petition for writ of habeas corpus.[3] The district court denied Martin's petition in September. 804 F.Supp. 1530 (1992).

## II. DISCUSSION

On appeal, Martin raises three arguments. First, Martin contends that the district court erred in finding probable cause to believe that he had committed the crimes with which he was charged. That argument is patently meritless. Second, Martin argues that he was entitled to bail pending a determination of his extraditability. Third, Martin asserts that Canada's alleged delay of over seventeen years in seeking his extradition violates his due process right to a "speedy extradition."

### A. *Denial of Bail.*

■ In extradition cases there is a presumption against bond. Defendants, like Martin, often are international fugitives. Consequently, a defendant in an extradition case will be released on bail only if he can prove "special circumstances." *Wright v. Henkel,* 190 U.S. 40, 63, 23 S.Ct. 781, 787, 47 L.Ed. 948 (1903); *In re Extradition of Ghandtchi,* 697 F.2d 1037, 1038 (11th Cir. 1983).[4]

*Burt,* 737 F.2d 1477, 1481 n. 9 (7th Cir.1984); *Plaster v. United States,* 720 F.2d 340, 347 (4th Cir.1983).

4. Some commentators have recently begun urging that bail decisions in international extradition cases be made to depend only on whether the defendant is a flight risk. *E.g.,* John G. Kester, *Some Myths of United States Extradition Law,* 76 Geo.L.J. 1441, 1449 (1988); Note, *A Recommended Approach to Bail in International Extradition Cases,* 86 Mich.L.Rev. 599 (1987). We, of course, are bound by Supreme Court and Eleventh Circuit precedent. Furthermore, we are aware of no decision in which a federal court

Before the magistrate and the district court, Martin argued that his case presented "special circumstances." The magistrate held that Martin failed to prove special circumstances. The district court affirmed and noted that Martin had in the past twice fled across international borders when he faced criminal prosecution. On appeal, Martin has abandoned his special circumstances argument; he lists none in his brief. Instead, Martin complains only that the district court erred in determining that he was a flight risk. Absent proof of special circumstances, however, Martin is not entitled to bail.

## B. *Due Process Right to "Speedy Extradition."*

We turn, then, to the principal issue raised in this appeal: whether there is a constitutional right under the Due Process Clause of the Fifth Amendment to a "speedy extradition."

■ The singular nature of extradition proceedings largely determines and explains the scope of a defendant's due process rights. Extradition is an executive, not a judicial, function. The power to extradite derives from the President's power to conduct foreign affairs. *See* generally U.S. Const. art. II, § 2, cl. 2; *United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 315–22, 57 S.Ct. 216, 218–21, 81 L.Ed. 255 (1936).[5] An extradition proceeding is not an ordinary Article III case or controversy. It clearly is not a criminal proceeding. *See* Fed. R.Crim.P. 54(b)(5) ("[t]hese rules are not ap-

plicable to extradition and rendition of fugitives"); Fed.R.Evid. 1101(d)(3) ("The rules ... do not apply ... [to] [p]roceedings for extradition or rendition...."). Rather, the judiciary serves an independent review function delegated to it by the Executive and defined by statute. *See, e.g., Jhirad v. Ferrandina*, 536 F.2d 478, 482 (2d Cir.) ("Orders of extradition are *sui generis.*"), *cert. denied*, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976).[6]

The inquiry conducted by an "extradition magistrate" is limited. *See* 18 U.S.C. §§ 3181–95. The extradition magistrate conducts a hearing simply to determine whether there is "evidence sufficient to sustain the charge [against the defendant] under the provisions of the proper treaty or convention." 18 U.S.C. § 3184. If the evidence is sufficient, the extradition magistrate makes a finding of extraditability and certifies the case to the Secretary of State. *Id.*

■ Habeas corpus review of an extradition magistrate's order is similarly restricted. Review is limited to determining "whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925) (Holmes, J.); *see also Escobedo v. United States*, 623 F.2d 1098, 1101 (5th Cir.), *cert. denied*, 449 U.S. 1036, 101 S.Ct. 612, 66 L.Ed.2d 497 (1980).[7]

---

has departed from the legal requirement that a defendant prove "special circumstances."

**5.** In a speech to the House of Representatives in 1800, Congressman—later Chief Justice—John Marshall declared "that the power to extradite pursuant to treaty rests in the executive branch as part of its power to conduct foreign affairs." Jacques Semmelman, *Federal Courts, the Constitution, and the Rule of Non–Inquiry in International Extradition Proceedings*, 76 Cornell L.Rev. 1198, 1206 (1991) (citing 10 *Annals of Cong.*, 6th Cong., 1st Sess., 596–618 (Mar. 7, 1800)).

**6.** Historically, the judiciary played no role in extradition. Between 1794 and 1842, "the Executive exercised complete control over extradition without reference to the courts." *Eain v. Wilkes*, 641 F.2d 504, 513 n. 13 (7th Cir.), *cert. denied*, 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981) (citing M. Cherif Bassiouni, *International Extradition and World Public Order* 505 (1974)).

Public outcry following one particularly controversial extradition case in the early 1800s, however, prompted the Executive to include language in the next extradition treaty it negotiated to provide for judicial involvement. *See* Jacques Semmelman, *International Extradition Proceedings* at 1207 (discussing Webster–Ashburton Treaty between the United States and Great Britain signed in 1842); *see also* Ruth Wedgwood, *The Revolutionary Martyrdom of Jonathan Robbins*, 100 Yale L.J. 229, *passim* (1990). A generally applicable extradition statute was enacted soon thereafter in 1848. The judiciary's limited role in extradition proceedings has not been materially altered since. Jacques Semmelman, *International Extradition Proceedings* at 1209.

**7.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

■ Extradition ultimately remains an Executive function. After the courts have completed their limited inquiry, the Secretary of State conducts an independent review of the case to determine whether to issue a warrant of surrender. The Secretary exercises broad discretion and may properly consider myriad factors affecting both the individual defendant as well as foreign relations which an extradition magistrate may not. The Secretary of State's decision is not generally reviewable by the courts. *Escobedo,* 623 F.2d at 1105.

■ The United States' actions in reviewing a request for extradition are, of course, subject to the constraints of the Constitution. The constitutional rights of individuals, including the right to due process, are superior to the government's treaty obligations. *Geisser v. United States,* 513 F.2d 862, 869 n. 11 (5th Cir.1975) (citing *Reid v. Covert,* 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957)); *In re Petition of Geisser,* 627 F.2d 745, 750 (5th Cir.1980), *cert. denied,* 450 U.S. 1031, 101 S.Ct. 1741, 68 L.Ed.2d 226 (1981); *see also In re Extradition of Burt,* 737 F.2d 1477, 1484 (7th Cir.1984); *Plaster v. United States,* 720 F.2d 340, 348 (4th Cir. 1983). Constitutional procedural protections which by their terms are applicable only in criminal cases, however, are unavailable in extradition proceedings. Accordingly, there is no Sixth Amendment right to a speedy trial in extradition cases. *Sabatier v. Dabrowski,* 586 F.2d 866, 869 (1st Cir.1978); *Jhirad v. Ferrandina,* 536 F.2d 478, 485 n. 9 (2d Cir.1976); *see also In re Extradition of*

*Burt,* 737 F.2d 1477, 1486 (7th Cir.1984).[8] Even if a treaty states that "the person whose extradition is sought shall have the right to use all remedies and recourses provided by [the law of the Requested State]," as does the treaty between the United States and Canada, the defendant does not have a right to a speedy extradition. *In re Extradition of Kraiselburd,* 786 F.2d 1395, 1398 (9th Cir.), *cert. denied,* 479 U.S. 990, 107 S.Ct. 586, 93 L.Ed.2d 588 (1986); *see also Kamrin v. United States,* 725 F.2d 1225, 1227–28 (9th Cir.), *cert. denied,* 469 U.S. 817, 105 S.Ct. 85, 83 L.Ed.2d 32 (1984).

■ Martin concedes that he has no Sixth Amendment right to a speedy extradition. He argues, however, that he is entitled to a speedy extradition under the Due Process Clause of the Fifth Amendment. It would make little sense to provide an extradition defendant indirectly with a right to a speedy trial under the Fifth Amendment when he enjoys no such right directly under the Sixth Amendment.[9]

Moreover, recognizing a Fifth Amendment right to a speedy extradition would conflict directly with the rule of non-inquiry which precludes extradition magistrates from assessing the investigative, judicial, and penal systems of foreign nations when reviewing an extradition request. According to the Supreme Court,

> When an American citizen commits a crime in a foreign country, he cannot complain if required to submit to such modes of trial

---

8. We have found only one district court case, cited by neither party, recognizing a constitutional right to a "speedy extradition." *See In re Extradition of Mylonas,* 187 F.Supp. 716 (N.D.Ala.1960). In *Mylonas,* a district judge in our circuit held: "I am of the opinion that the accused has not been afforded a speedy trial, and that extradition should be denied on that ground." As an alternative ground for decision, the district judge held that extradition was barred because it was sought for a political offense. No appeal was taken in that case. We expressly disapprove of the district court's holding that a defendant has a Sixth Amendment right to a "speedy extradition."

9. Although it is inapplicable in this case, some defendants may raise a due process issue in an extradition proceeding based on commitments

the United States may have made in the course of plea bargaining. Not surprisingly, some defendants accused of committing crimes abroad also committed crimes in the United States. The United States has sometimes offered protection from extradition to a defendant to induce cooperation. *E.g., Plaster v. United States,* 720 F.2d at 352 (promise not to extradite); *Geisser v. United States,* 513 F.2d at 864 (promise to use "best efforts" to avoid extradition). A defendant has a due process right to enforce the terms of such a plea bargain. Even though such a promise may conflict with the United States' obligation to a treaty partner, "[i]f the United States government has not complied with the plea bargain, [the defendant's] constitutional claim is a valid one and a purported treaty obligation cannot override an individual's constitutional right." *In re Petition of Geisser,* 627 F.2d at 750.

and to such punishment as the laws of that country may prescribe for its own people, unless a different mode be provided for by treaty stipulations between that country and the United States.

*Neely v. Henkel*, 180 U.S. 109, 123, 21 S.Ct. 302, 307, 45 L.Ed. 448 (1901). When a defendant is tried in a foreign country, he or she is entitled only to the procedural protections accorded by foreign law. Recognizing a right to a speedy extradition would simply be an oblique method of forcing treaty partners to adhere to the speedy trial guarantee contained in the United States Constitution. No circuit court has recognized such a right. *E.g., Kamrin v. United States*, 725 F.2d at 1228 ("Time may have eroded [a defendant's] ability to present a defense . . ., but time has not eroded the holding of *Neely*."); *In re Extradition of Burt*, 737 F.2d at 1487 (delay of over a decade in requesting extradition did not "trigger due process concerns").[10] There is no due process violation if Martin is tried in Canada according to Canadian law and procedure for his actions while in Canada.

In short, the United States made no commitment to Martin not to extradite him and the judiciary has conducted its statutorily prescribed inquiry. All that remains is for the State Department to review Martin's case. Once the Executive has done so, Martin will have received all the process he is due.

Martin should direct his argument that extradition is unjust in this case based on Canada's alleged lengthy delay in seeking extradition or on humanitarian grounds to the Executive Branch. The Secretary of State will, ultimately, determine whether Martin should be surrendered pursuant to the Extradition Treaty.

## III. CONCLUSION

For the foregoing reasons, we hold that Martin was not entitled to bail and that there is no due process right to a "speedy extradition." Accordingly, the district court's denial of Martin's petition for a writ of habeas corpus is

AFFIRMED.

RONEY, Senior Circuit Judge, concurring:

I concur in the decision that petitioner is not entitled to relief from extradition in this case. Although the combination of delay and other factors could entitle a United States citizen subject to extradition to a foreign country to due process protection, that right being superior to the government's treaty obligation, there are no facts present in this case to trigger that right. Delay alone does not violate due process rights.

---

10. Although the rule of non-inquiry is not without critics, it has been subject to assault only in dicta. Since the Second Circuit first suggested in 1960 that the rule of non-inquiry might be displaced where a defendant faces procedures in a foreign country "antipathetic to a federal court's sense of decency," *Gallina v. Fraser*, 278 F.2d 77, 79 (2d Cir.), *cert. denied*, 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960), a number of circuits have also hinted that a defendant may be able to bring a due process challenge to extradition proceedings based on humanitarian considerations. *Prushinowski v. Samples*, 734 F.2d 1016, 1019 (4th Cir.1984) (extradition may be barred if "the prisons of a foreign country regularly opened each day's proceedings with a hundred lashes applied to the back of each prisoner who did not deny his or her God or conducted routine breakings on the wheel for every prisoner"); *In re Extradition of Burt*, 737 F.2d at 1487 (due process challenge may be founded on "exceptional constitutional limitations as may exist because of particularly attrocious [sic] proce-

dures or punishments employed by the foreign jurisdiction.").

We are aware, however, of no federal court decision that has actually blocked extradition on this ground. Circuits which have recently addressed this issue have also strictly adhered to the rule of non-inquiry. *Koskotas v. Roche*, 931 F.2d 169, 173–74 (1st Cir.1991); *Quinn v. Robinson*, 783 F.2d 776 (9th Cir.), *cert. denied*, 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986). We note that the Second Circuit itself has, in a recent extradition decision, distanced itself from *Gallina*. *See Ahmad v. Wigen*, 910 F.2d 1063, 1066 (2d Cir.1990).

This circuit never embraced the *Gallina* dictum. We explicitly held that judicial intervention in extradition proceedings based on humanitarian considerations is inappropriate. *Escobedo v. United States*, 623 F.2d 1098, 1107 (5th Cir. 1980). Rather, humanitarian considerations are matters properly reviewed by the Department of State. *Id.*