**In the Matter of The EXTRADITION OF Nicolas FULGENCIO GARCIA, Fugitive from the Government of the United States of Mexico.**

**No. 01 M 307.**

United States District Court,
N.D. Illinois,
Eastern Division.

March 4, 2002.

Theodore T. Poulos, Cotsirilos Tighe & Streiker, Ltd., Chicago, IL, for Nicolas Fulgencio Garcia.

Joan B. Safford, Deputy United States Attorney, Chicago, IL, for the United States.

*AMENDED MEMORANDUM OPINION AND ORDER GRANTING CERTIFICATION OF EXTRADITABILITY AND ORDER OF COMMITMENT*

MORTON DENLOW, United States Magistrate Judge.

The Government of the United Mexican States ("Mexico") has requested the extradition of Nicolas Fulgencio Garcia ("Fulgencio") pursuant to the Extradition Treaty between the United States and Mexico, dated May 4, 1978, 31 U.S.T. 5059, TIAS 9656 ("Treaty"). Fulgencio is charged in the State of Michoacan, Mexico, with committing the crimes of *Lesiones* (Injuries) and *Homicidio* (Homicide) against his common-law wife Irene Gonzalez Villagomez ("Gonzalez"). The Government of Mexico is seeking his extradition for trial on these offenses and an order of commitment to the custody of the United States Marshal pending final disposition of this matter by the Secretary of State.

On January 10, 2002, an extradition hearing was conducted by the Court. Fulgencio contests his extradition primarily on the argument that the evidence submitted would be inadmissible in a federal criminal trial and did not constitute competent evidence upon which to base a finding of probable cause under the Treaty.

The Court has carefully considered the testimony of the witness who appeared at the hearing, the exhibits introduced into evidence, the written submissions of the parties and the fine arguments of counsel. The Court finds there is sufficient competent evidence to sustain a finding of probable cause and Fulgencio should be extradited to Mexico in accordance with the Treaty. Fulgencio is committed to the custody of the United States Marshal pending final disposition of this matter by the Secretary of State.

## I. THE EXTRADITION PROCESS

The process of extraditing a fugitive from the United States to Mexico is governed by the provisions of the federal extradition statute, 18 U.S.C. §§ 3181 et seq., and the extradition treaty between the United States and Mexico, TIAS 9656. Under 18 U.S.C. § 3181, the provisions of the federal extradition statute apply during the existence of a valid extradition treaty. Under Article 1 of the Treaty, the United States and Mexico mutually agree to extradite fugitives who are charged with crimes in one country and subsequently found within the territory of the other. (Treaty p. 3) [1].

The process begins with the discovery of a foreign fugitive within the territory of the United States. Under Article 11 of the Treaty, Mexico may then request the provisional arrest of the fugitive, and the United States must comply with a valid request. (*Id.* at 10). The request must contain a description of the person sought, a description of his alleged crimes, a declaration of the existence of a warrant for his arrest, and an undertaking to submit a formal request for extradition. (*Id.*). If a formal request for extradition and the required supporting documents are not filed within sixty days of the apprehension of the fugitive, the provisional arrest must be terminated. (*Id.*). However, this will not prejudice the extradition once the required documents have been submitted. (*Id.*). Likewise, 18 U.S.C. § 3184 authorizes a judicial officer to issue a warrant for the arrest for any fugitive whose extradition is requested, upon a sworn complaint charging the fugitive with committing an extraditable offense.

---

1. Government Exhibit A, Case No. 01 M 307, Extradition Treaty between the United States and the United Mexican States, TIAS 9656.

The second stage in the extradition process is the submission of a formal request for extradition. Article 10 of the Treaty lists the required contents of a formal request for extradition, and requires that it be submitted through diplomatic channels. (Treaty p. 8). In addition to the formal request, supplementary documents must be provided. Among the documents required for a fugitive not yet convicted are a certified copy of the warrant for the fugitive's arrest issued by a judge of the requesting party, and "[e]vidence which, in accordance with the laws of the requested Party, would justify the apprehension and commitment for trial of the person sought if the offense had been committed there" (*Id.* at 8–9). Article 10 further directs that these documents shall be received into evidence if they are certified by the principal consular officer of the United States in Mexico. (*Id.* at 9–10). Likewise, the federal extradition statute provides that documentary evidence proffered by a foreign government requesting extradition will be admissible if it is certified to be properly authenticated by the principal consular officer of the United States in the requesting country. 18 U.S.C. § 3190 (2001). *See also In re Assarsson,* 635 F.2d 1237, 1245–46 (7th Cir.1980).

The next step in the extradition process is the extradition hearing conducted by a federal court in order to hear the evidence and determine whether that evidence is "sufficient to sustain the charge under provisions of the proper treaty or convention." 18 U.S.C. § 3184 (2001). Article 3 of the Treaty states that "[e]xtradition shall be granted only if the evidence be found sufficient, according to the laws of the requested Party, ... to justify the committal for trial of the person sought if the offense of which he has been accused had been committed in that place." (Treaty p. 5).

Finally, where the judge determines that the evidence is sufficient to warrant extradition, he certifies this to be the case and forwards all the evidence taken before him to the Secretary of State. 18 U.S.C. § 3184. The judge also issues a warrant for the commitment of the fugitive until surrender to the foreign government can be made. Id. The final decision on whether or not to extradite the fugitive is reserved to the Secretary of State. 18 U.S.C. § 3186 (2001). Likewise, Article 14 of the Treaty provides that if extradition is granted, surrender shall then be made at such time and place as determined according to the laws of the requested country. (Treaty p. 12).

## II. REQUEST FOR EXTRADITION OF NICOLAS FULGENCIO GARCIA

Fulgencio was initially arrested and detained on unrelated charges by the Police Department in Hodgkins, Illinois. (Complaint & 7g.)[2]. When federal authorities learned that there was an outstanding warrant issued by Mexico for his arrest for Homicide, and that the Ambassador from Mexico was making a request for provisional arrest, Fulgencio was taken into federal custody. (*Id.*). A warrant for provisional arrest was issued by this Court on October 15, 2001. An initial appearance was held on October 15, 2001, and Fulgencio was ordered detained pending receipt of a formal request for extradition.

Mexico then submitted a formal request for extradition[3] with supporting docu-

---

**2.** Complaint for Provisional Arrest, Case No. 01 M 307.

**3.** The formal request for extradition is contained in Government Exhibit A, Case No. 01 M 307. Government Exhibit A contains three

documents: 1. a declaration from the State Department, 2. the formal request for extradition, and 3. a copy of the extradition treaty between the United States and Mexico, TIAS 9656.

ments[4] to the American Consulate in Mexico City. The formal request for extradition and supporting documents were received and authenticated by Miriam K. Hughes, Consul General of the United States of America in Mexico, on Dec. 7, 2001. (Gov. Ex. B p. 1)[5]. They were then submitted to the State Department in Washington, D.C. by the Embassy of Mexico on December 10, 2001. (Gov. Ex. A p. 1)[6]. They were certified by Ashley S. Deeks, Attorney Advisor in the Office of the Legal Advisor of the State Department, acting on behalf of Secretary of State Colin L. Powell, on Dec. 11, 2001. (*Id.* at 1–3). The certification declares that there is an extradition treaty between the United States and Mexico, TIAS 9656, which is in full force and effect. (*Id.*). The certification further declares that Miriam K. Hughes was the principal consular officer of the United States in Mexico, and that the documents submitted by Mexico had been certified by her to be properly authenticated pursuant to 18 U.S.C. § 3190. (*Id.* at 3).

## III. PRELIMINARY FINDINGS

The Court finds the formal request for extradition and supporting documents are in compliance with the content requirements of Article 10 of the Treaty. The Court further finds the formal request for extradition and supporting documents were submitted within the time frame provided for in Article 11 of the Treaty. Finally, the Court finds the documents submitted were properly certified by the principal consular officer of the United States in Mexico. Therefore, the documents submitted are admissible for the

purpose of this extradition proceeding, as per Article 10 of the Treaty and 18 U.S.C. § 3190.

## IV. EXTRADITION OF DEFENDANT TO MEXICO IS PROPER

▆▆▆▆ The general purpose of an extradition hearing under 18 U.S.C. § 3184 is to provide a judicial determination that extradition is proper under the circumstances. A request for extradition will be granted if the following findings are made:

1. The judicial officer has jurisdiction to conduct an extradition proceeding,

2. The Court has jurisdiction over the fugitive,

3. The person before the Court is the fugitive named in the request for extradition,

4. There is an extradition treaty in full force and effect,

5. The crimes for which surrender is requested are covered by that treaty, and

6. There is competent legal evidence to support the finding of probable cause as to each charge for which extradition is sought.

*Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 69 L.Ed. 970 (1925); *Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir.1981); *Lindstrom v. Gilkey*, No. 98 C 5191, 1999 WL 342320, at *2 (N.D.Ill. May 14, 1999).

## A. JURISDICTION OF THE JUDICIAL OFFICER

The statute governing extradition proceedings, 18 U.S.C. § 3184, authorizes a

---

4. The supporting documents to the formal request for extradition are contained in Government Exhibit B, Case No. 01 M 307. Government Exhibit B contains three sets of documents: 1. a certification of the authenticity of the documents submitted, 2. Injuries Exhibits numbered one through eleven, and 3.

Homicide Exhibits numbered one through eleven.

5. Government Exhibit B, Case No. 01 M 307.

6. Government Exhibit A, Case No. 01 M 307.

broad class of judicial officers to hear extradition cases. Federal magistrate judges are expressly authorized to hear and decide extradition cases if "authorized to do so by a court of the United States." 18 U.S.C. § 3184 (2001). The local rules for the Northern District of Illinois specifically authorize a magistrate judge to "[i]ssue a warrant for the arrest of a fugitive from a foreign country and conduct all necessary hearings under the provisions of the proper treaty or convention." N.D. Ill. Rule 1.70(B)(1)(j). In addition, the jurisdiction of federal magistrate judges in extradition proceedings has been upheld as being consistent with Article III of the Constitution. *Ward v. Rutherford*, 921 F.2d 286, 289 (D.C.Cir.1990). Fulgencio does not contest this Court's jurisdiction over extradition proceedings. The Court has the requisite subject matter jurisdiction over this proceeding.

## B. JURISDICTION OF THE COURT OVER THE PERSON

The extradition statute further provides that jurisdiction will apply to any person found within the jurisdiction of the court. 18 U.S.C. § 3184. Fulgencio was initially found, and is now in federal custody, within the jurisdiction of the Northern District of Illinois. (Complaint p. 6). Fulgencio does not dispute that the Court has jurisdiction over him. The Court has the requisite personal jurisdiction to make a determination on the extraditability of Nicolas Fulgencio Garcia pursuant to 18 U.S.C. § 3184.

## C. IDENTITY OF FUGITIVE

Fulgencio has waived the right to an identity hearing and does not dispute that he is the Nicolas Fulgencio Garcia sought by Mexico. (Trans.9)[7]. The Court finds that the defendant is the Nicolas Fulgencio Garcia named in the extradition request and supporting documents proffered by the government of Mexico.

## D. EXISTENCE OF EXTRADITION TREATY

United States law limits extradition to cases in which a treaty is in force between the requesting country and the United States. 18 U.S.C. § 3181 (2001). *See also Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 8–9, 57 S.Ct. 100, 81 L.Ed. 5 (1936). The United States has submitted a declaration from the State Department in Washington, D.C., dated December 11, 2001, which verifies that the Extradition Treaty between the United States and Mexico, TIAS 9656, was signed on May 4, 1978, and is presently in full force and effect. (Gov.Ex.A, p. 1). A copy of the Treaty is attached to the declaration. Fulgencio does not contest that an extradition treaty between the United States and Mexico is in full force and effect. The Court finds that there is a valid extradition treaty in full force and effect between the United States and Mexico.

## E. CRIMES UNDER THE TREATY

Under 18 U.S.C. § 3184, extradition will be considered where there is a sworn complaint charging the fugitive with a crime provided for in the applicable extradition treaty. Article 2 of the Treaty provides that: "[e]xtradition shall take place, subject to this Treaty, for wilful acts which fall within any of the clauses of the Appendix and are punishable in accordance with the laws of both Contracting Parties by deprivation of liberty the maximum of which shall not be less than one year." (Treaty p. 4). In addition, Article 7 of the Treaty provides that extradition shall not be granted where the statute of limitations has run on the crime in either country. (*Id.* at 6–7). In assessing the

---

7. Hearing Transcript, January 10, 2002, Case No. 01 M 307. ("Trans.").

duality of the crimes charged in an extradition proceeding, the Court may refer to either the federal or state law of the United States. *Cucuzzella v. Keliikoa*, 638 F.2d 105, 107 (9th Cir.1981). The Court will not simply look for common names, but will assess what charges would be forthcoming had the facts alleged occurred within a domestic jurisdiction. *Collins v. Loisel*, 259 U.S. 309, 312, 42 S.Ct. 469, 66 L.Ed. 956 (1922); *Messina v. United States*, 728 F.2d 77, 79 (2d Cir.1984).

The government of Mexico has proffered a sworn complaint by Irene Gonzalez Villagomez charging Fulgencio with the crime of *Lesiones* (Injuries). (Inj.Ex.2). Mexico has also proffered the sworn complaint of Elia Villagomez Pizano charging Fulgencio with the crime of *Homicidio* (Homicide). (Hom.Ex.3). Included among the offenses listed in the Appendix of the Treaty are: "Murder or manslaughter" and "Malicious wounding or injury." (Treaty p. 18). The crime of Injuries is covered under Article 269 and punishable under Article 271 of the Penal Code for the State of Michoacan, with a maximum penalty of fifteen years. (Inj. Ex. 10 p. 5). The crime of Homicide is covered under Article 260 and punishable under Article 271 of the Penal Code for the State of Michoacan, with a maximum penalty of forty years. (Hom. Ex. 11 p. 5). These facts were verified by Juan J. Bremer, Ambassador to the United States from Mexico, in the formal request for extradition. (Gov.Ex.A, pp. 4–5). Each of the crimes is also a felony violation of Illinois State law. Under these circumstances, the crime of Injuries would constitute heinous battery under Illinois law, 720 ILCS 5/12–4.1, punishable by incarceration for up to forty-five years. The crime of Homicide in this instance would be punishable as murder in the first degree under 720 ILCS 5/9–1, with a maximum penalty of death. *See In re Extradition of Salas*, 161 F.Supp.2d 915, 924 (N.D.Ill.2001) (finding that homicide is covered under both Mexican and Illinois law, as per the Treaty). Finally, the statute of limitations for both crimes has not run in either Mexico or the United States. Under Article 93 (Inj. Ex. 10 p. 2) and Article 271 (*Id.* at 5) of the Penal Code for the State of Michoacan, the statute of limitations for the crime of Injuries will run in 11.5 years. Under Article 93 (Hom. Ex. 11 p. 2) and Article 267 (*Id.* at 5) of the Penal Code for the State of Michoacan, the statute of limitations for the crime of Homicide will run in 30 years. Under 720 ILCS 5/3–5, there is no statute of limitations for first degree murder in Illinois, and the statute of limitations for heinous battery runs in three years.

Fulgencio does not contest that the crimes for which he is charged are covered under the terms of the Treaty. The Court finds that the crimes for which Fulgencio was charged, Injuries and Homicide, were supported by sworn complaints and are covered under the terms of the Treaty.

## F. PROBABLE CAUSE TO EXTRADITE

 Under 18 U.S.C. § 3184, a judicial officer is required to make a determination as to whether the evidence submitted is "sufficient to sustain the charge under provisions of the proper treaty or convention." Article 3 of the Treaty states that "[e]xtradition shall be granted only if the evidence be found sufficient, according to the laws of the requested Party, ... to justify the committal for trial of the person sought if the offense of which he has been accused had been committed in that place." (Treaty p. 5). It is well settled that the terms of an extradition treaty should be liberally construed so as to effect the intention of the parties to secure the open and reciprocal surrender of fugitives to be tried for extraditable offenses. *See, e.g., Factor v. Laubenheimer*, 290 U.S. 276,

293–94, 54 S.Ct. 191, 78 L.Ed. 315 (1933); *United States v. Wiebe*, 733 F.2d 549, 554 (8th Cir.1984). The rationale for this rule is that extradition is an executive function, not a judicial one. *See Martin v. Warden*, 993 F.2d 824, 828 (11th Cir.1993). Hence, an extradition proceeding is not a criminal proceeding, but rather serves an independent review function. *Id.* Accordingly, the Seventh Circuit has acknowledged that in the context of extradition, "we must move with the circumspection appropriate when [a court] is adjudicating issues inevitably entangled in the conduct of our international relations." *In re Burt*, 737 F.2d 1477, 1487 (7th Cir.1984) (citing *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 383, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959)). Courts have long been unsympathetic to objections to extradition which "savor of technicality." *Bingham v. Bradley*, 241 U.S. 511, 517, 36 S.Ct. 634, 60 L.Ed. 1136 (1916).

### 1. Evidence of Injuries

The following is the documentary evidence provided by Mexico as to the existence and basis of the charge of Injuries against Fulgencio. The documents are contained in Government Exhibit B and designated Injuries Exhibits 1–11. On November 16, 2000, the residing physician at the De la Salud Hospital informed an Investigating Agent of the Public Prosecutor for Morelia, Michoacan, Esther Reyes Piceno ("Agent Reyes"), that Irene Gonzalez Villagomez had been admitted to the hospital with second degree burns which appeared to be the result of illegal conduct. (Inj.Ex.1)[8]. Agent Reyes personally observed the victim's second degree burns on the neck and face, both forearms, and the lower back thighs and legs, among other places. (Inj.Ex.3). According to the residing physician's medical injury certificate, the second degree burns extended over 40 percent of the victim's body surface and were life threatening. (Inj.Ex.4).

On November 16, 2000, Agent Reyes obtained a statement and complaint from the victim, Gonzalez. (Inj. Ex. 4 p. 1). The statement was signed and sworn, and Gonzalez was informed of the prospect of imprisonment for perjury. (*Id.*). Gonzalez stated that she had been Fulgencio's common law wife for approximately 15 years. (*Id.*). They had three children together. (*Id.*). However, the relationship was persistently abusive, and he regularly beat her. (*Id.*). On November 15, 2000, at around 9:00 p.m., Fulgencio woke her out of bed and demanded his dinner. (*Id.* at 2). She went to start the fire, and crouched down beside the hearth to tend it. (*Id.*). As she did so, Fulgencio approached with a container of gasoline. (*Id.*). He started to pour the contents into a pan under the fire, but then sprayed the gas onto her. (*Id.*). The gas ignited and she was consumed in flames. (*Id.*). She ran to get buckets of water and succeeded in dousing the flames. (*Id.*). Her husband grabbed her, covering her mouth, and forced her out of the house into the backyard. (*Id.*). There she pleaded to be let back in because she believed she was dying, but her husband told her that if she didn't stop shouting he would finish killing her. (*Id.*). Her husband then accused her of sleeping with his father, his brothers, and their neighbors. (*Id.*). She begged for pity, but he told her he would not stop until he finished killing her. (*Id.*). At that point, their daughter woke up and turned on a light. (*Id.*). While Fulgencio was distracted, she hid from him. (*Id.*). When he failed to find her, he gathered their three children and left in their car to look for her. (*Id.*). She then ran to a neighbor's house. (*Id.*). Her neighbor's husband took her to a friend's house, and

---

**8.** Government Exhibit B, Case No. 01 M 307, Injuries Exhibit 1.

from there she called her mother-in-law. (*Id.*). Her mother-in-law came and took her to the hospital. (*Id.*).

On November 22, 2000, an Investigating Agent of the Public Prosecutor for Morelia, Michoacan, Maria Dolores Barrera Tovar ("Agent Barrera"), took the sworn statement of Jesus Fulgencio Campos, Fulgencio's father. (Inj. Ex. 6 p. 1). Fulgencio Campos confirmed that Gonzalez had been Fulgencio's common law wife. (*Id.*). He further stated that Fulgencio is very violent, and from the beginning of their relationship he had beaten her. (*Id.* at 2). On November 16, 2000 at around 1:00 a.m., Fulgencio was called by Celia Chavez Gonzalez ("Chavez"). (*Id.* at 1). Chavez told him to come to her house because Gonzalez was there, and she had been burned by his son. (*Id.*). He went immediately to the house and saw Gonzalez, severely burned. (*Id.*).

Gonzalez told him the following account of what had happened. Earlier that evening Fulgencio told her to get his dinner. (*Id.*). As she was crouching by the fire to fix dinner, Fulgencio threw gasoline on her which ignited, burning her. (*Id.*). After she doused the fire with buckets of water, Fulgencio covered her mouth to keep her from screaming. (*Id.*). Then one of their children woke up and Fulgencio went to take care of the child. (*Id.*). She then hid from Fulgencio in a water tank. (*Id.*). Fulgencio looked for her and shouted that he was going to finish her off, but didn't find her. (*Id.*). He then went off to search for her, and she seized the opportunity to go yell for a neighbor to take her to Chavez's house. (*Id.* at 1–2). Fulgencio had not seen his son since the day of the incident. (*Id.* at 2).

On November 22, 2000, Agent Barrera took the sworn statement of Chavez. (Inj. Ex. 7 p. 1). Chavez stated that she knew Gonzalez through regularly selling her milk. (*Id.*). On November 16, 2000, at around 2:00 a.m., Gonzalez arrived at her house accompanied by a neighbor, a young man whom Chavez did not recognize. (*Id.*). The young man told Chavez that Gonzalez had asked to be brought to her house because her husband had burned her, and she was afraid. (*Id.*). Chavez observed that Gonzalez was very badly burned on her face and over much of her body. (*Id.*). Gonzalez then asked Chavez to contact her father-in-law, Jesus Fulgencio Campos, who came immediately and contacted a doctor. (*Id.*). After the doctor examined her, he ordered an ambulance to take Gonzalez to the hospital for medical attention. (*Id.*). Gonzalez never told her the reason why Fulgencio had burned her. (*Id.* at 2). However, she had heard rumors that Fulgencio beat Gonzalez, but she could not confirm those rumors. (*Id.*).

Included in the documentary evidence proffered by the Mexican government was a police report on the Injuries investigation of victim Gonzalez. (Inj.Ex.5). The report found substantially the same events as related in the affidavits above, and also noted that Chavez had told investigators that Gonzalez was practically naked and severely burned when she arrived at her house. (*Id.* at 2).

On November 23, 2000, there was a request for exercising criminal action against Fulgencio for the crime of Injuries signed by Agent Barrera on November 23, 2000. (Inj.Ex.8). The indictment recounted substantially the same findings, and noted that Fulgencio had fled the jurisdiction. (*Id.* at 4).

Finally, there was an arrest warrant issued against Fulgencio for the crime of Injuries signed by Alejandro Pardo Ontiveros, Seventh Criminal Trial Judge for the Michoacan Judicial District, on February 20, 2001. (Inj.Ex.9). The warrant recounted substantially the same findings

mentioned above, and further related that the local police had gone to the house of Fulgencio's sister, Cecilia Fulgencio Garcia, in an attempt to detain Fulgencio for questioning. (*Id.* at 5). Fulgencio's sister stated that Fulgencio had left his three children with her at 3:00 a.m. on the night of the incident. (*Id.*). He told her that he would soon return, but never came back. (*Id.*). She suggested that he might have gone to stay with relatives in the United States. (*Id.*).

## 2. Evidence of Homicide

The following is the documentary evidence provided by Mexico as to the existence and basis of the charge against Fulgencio for Homicide. The documents are contained in Government Exhibit B and designated Homicide Exhibits 1–11. The documentary evidence submitted for the crime of Injuries, addressed above, was also submitted for the crime of Homicide. (Hom.Ex.7)[9]. The documents include a record of the phone call on Jan. 14, 2001, from the resident physician at the Sanatorio de la Salud Hospital, informing Agent Pecino that Gonzalez had died. (Hom.Ex.1). Agent Pecino then went to verify that the corpse was that of Gonzalez and signed an affidavit to that effect. (Hom.Ex.2). The record contains a Coroner's report identifying the corpse as that of Gonzalez and reporting that death was caused by asphyxiation. (Hom.Ex.5). The report indicated that Gonzalez had asphyxiated on her own infectious fluids as a result of the first and second degree burns covering 60% to 70% of her body. (*Id.*)

On January 14, 2001, Agent Reyes took the sworn statement and complaint of Elia Villagomez Pizano ("Pizano") and Irma Gonzalez Villagomez, Gonzalez's mother and sister, respectively. (Hom. Ex. 3 p. 1). The two identified the corpse as that of Irene Gonzalez Villagomez. (*Id.*). Pizano further made a statement as to what her daughter had told her when she visited the hospital on November 19. (*Id.*). Gonzalez told her that Fulgencio had burned her in a jealous rage, accusing her of sleeping with her father-in-law and brothers-in-law. (*Id.* at 2). Gonzalez also told her that eight days earlier Fulgencio had beaten her for changing her hair style, and had broken the fingers on her right hand. (*Id.*). Gonzalez then related an account of what had happened. On the day of the incident Fulgencio followed her around the whole day. (*Id.*). At around 9:00 p.m. Fulgencio told her to take the children to bed. (*Id.*). He then told her to make his dinner. (*Id.*). She lit the fire and started to heat up some tortillas. (*Id.*). Fulgencio approached with a container filled with approximately two liters of gasoline, which he threw into her face while she was sitting next to the fire. (*Id.* at 2–3). Gonzalez got up and ran to their yard to douse the fire with containers of water. (*Id.* at 3). Fulgencio followed her out and after the fire had been extinguished, put his hand over her mouth to keep her from screaming. (*Id.*). He then told her that even though she had saved herself from being burnt, she would "sleep" because he was going to kill her now. (*Id.*). He pushed her to the ground and refused to let her back in the house. (*Id.*). Their daughter then turned on the light and started to come out of the house calling for her mother. (*Id.*). Fulgencio went to put his daughter back to bed, at which time Gonzalez went into the house and hid in a water basin. (*Id.*). Fulgencio looked for her, but when he couldn't find her, he took the three children to the house of his sister, Cecilia. (*Id.*). When Fulgencio left, Gonzalez went to ask the neighbors for help. (*Id.*). They took her to a friend's house, where she called her moth-

9. Government Exhibit B, Case No. 01 M 307, Homicide Exhibit 7.

er-in-law, Cecilia Garcia Soto. (*Id.*). The mother-in-law arrived and took Gonzalez to the hospital. (*Id.*).

The documentary evidence proffered by Mexico included an Indictment Without Detained Person of Fulgencio for the crime of Homicide, signed by Agent Barrera on February 7, 2001. (Hom.Ex.8). Also included was an arrest warrant issued for Fulgencio for the crime of Homicide committed against Irene Gonzalez Villagomez. (Hom.Ex. 9). The arrest warrant was signed by Aaron Chavez Rojas, Fifth Judge in Criminal Matters for the Michoacan Judicial District, on March 7, 2001. (*Id.* at 7).

### 3. Arguments and Testimony at the Extradition Hearing

A hearing was held before this Court on January 10, 2002. Having waived the issue of identity (Trans.9), Fulgencio elected to present an oral argument contesting extradition on the basis of the sufficiency of the evidence. (Trans.4). Fulgencio asserted that under Article III of the Treaty, a request for extradition would only be honored if the evidence presented by the requesting country was sufficient to warrant committal for trial under the laws of the requested country, applied as if the crime had been committed in the requested country. (Trans.9–10). From this, Fulgencio asserted that evidence sufficient to support a finding of probable cause in an extradition hearing would be equivalent to that required in a domestic preliminary hearing under Federal Rule of Criminal Procedure 5.1. (Trans.9). Although Fulgencio conceded that the Federal Rules of Criminal Procedure do not apply to extradition hearings by their express terms (Trans.13), he alluded to precedent which emphasized the strong analogy between the procedures. (Trans.9). While acknowledging that hearsay is admissible under either procedure, Fulgencio further argued that both procedures required a showing of "competent legal evidence" sufficient to support a finding. (Trans.9). To illustrate the distinction, Fulgencio cited verbatim to the Advisory Committee Notes on FRCP 5.1, which state: "To provide that a probable cause finding may be based upon hearsay does not preclude the Magistrate from requiring a showing that admissible evidence will be available at the time of trial." (Trans.13–14).

Fulgencio argues that the evidence submitted fails the test of legal competency, and therefore extradition should be denied. (Trans.14–15). He contends that substantially all the evidence relies upon the hearsay statements of the decedent, made either directly in her affidavit or through third parties. (Trans.10). Since such hearsay would be presumptively inadmissible in an American criminal trial, and since testimony by the decedent is clearly not forthcoming (Trans.10–11), this evidence is not legally competent to support a finding of probable cause. (Trans.13–14).

Fulgencio further contends that there are inconsistencies within the general account of events proffered by Mexico. For one, Fulgencio asserts that in some accounts he is accused of pouring gasoline on the fire, and incidentally splashing some on Gonzalez. (Trans.11). In others, he is accused of pouring the gasoline directly onto her. (Trans.11). Second, the documents submitted completely fail to identify the neighbor who took Gonzalez to Chavez's house. (Trans.12). Finally, some of the accounts related that Gonzalez called to a neighbor for help, but in fact the house where the incident occurred is in a rural area, and the nearest neighbors are about a mile away. (Trans.12–13). Fulgencio argued that these inconsistencies further militate against a finding of probable cause. (Trans.14–15).

In support of his contention that the nearest neighbor was at least a mile away,

Fulgencio offered the testimony of his brother, Cirilio Fulgencio. (Trans.24). Cirilio Fulgencio testified that he was the brother of the defendant, Nicolas Fulgencio Garcia, and that Irene Gonzalez Villagomez had been Fulgencio's common law wife. (Trans.24). He further testified that he had built the house in Michoacan, Mexico in which the two had lived, and in which the crimes had allegedly occurred. (Trans.26). He then testified that the nearest town was two or three miles away, and that the nearest neighbor lived about a mile away from that house. (Trans.25–26).

### 4. Standard of Probable Cause

■■■ The standard of probable cause in an extradition hearing is established by federal law. *Eain v. Wilkes,* 641 F.2d at 507–08. The assessment to be made is therefore similar to the one in a preliminary hearing under the Federal Rule of Criminal Procedure 5.1. *Ward v. Rutherford,* 921 F.2d at 287; *See also Benson v. McMahon,* 127 U.S. 457, 462–63, 8 S.Ct. 1240, 32 L.Ed. 234 (1888). This Court is not required to determine whether Fulgencio is guilty, but merely whether there was competent legal evidence which would justify his apprehension and commitment for trial if the crime had been committed in Illinois. *Collins v. Loisel,* 259 U.S. 309, 314–315, 42 S.Ct. 469, 66 L.Ed. 956 (1922). Probable cause will be found where there is evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the guilt of the accused. *In re Extradition of Guillen,* No. 90 CR 1056, 1991 WL 149623, at *8 (N.D.Ill. July 12, 1991) (citing *Coleman v. Burnett,* 477 F.2d 1187, 1202 (D.C.Cir.1973)). "In making this determination, courts apply a 'totality of the circumstances analysis' and 'make a practical, common sense decision whether, given all the circumstances . . ., there is a fair probability' that the defendant committed the crime." *In re Extradition of Okeke,* No. 96–7019P–01, 1996 WL 622213, at *5 (D.N.J. Sept.5, 1996) (quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

■■■ On the other hand, "when a court in an extradition proceeding is presented with evidence through affidavits, the court may conclude, on a review of the affidavits submitted, that there are insufficient *inidicia* of reliability or credibility to establish probable cause." *In re Extradition of Singh,* 124 F.R.D. 571, 577 (D.N.J. 1987). *See also Eain v. Wilkes,* 641 F.2d at 510 (statements of accomplice reliable because they were against his own interest); *Republic of France v. Moghadam,* 617 F.Supp. 777, 783 (N.D.Cal.1985) (extradition denied because recantation of sole accuser had more indicia or reliability than accusations). Likewise, where charges amount to mere conclusory allegations unsupported by substantive evidence, extradition will be denied. *U.S. v. Fernandez–Morris,* 99 F.Supp.2d 1358, 1366 (S.D.Fla.1999).

■■■ There are crucial distinctions between the assessment to be made in an extradition hearing and one to be made in a preliminary hearing under Rule 5.1. These distinctions are ultimately grounded on the fundamental principle of comity that, among nations, "no one can rightfully impose a rule on another." *Rosado v. Civiletti,* 621 F.2d 1179, 1192 (2d Cir.1980) (citing *The Antelope,* 10 Wheat. 66, 23 U.S. 66, 122, 6 L.Ed. 268 (1825) (Marshall, C.J.)) First, an extradition hearing is not a criminal proceeding. *DeSilva v. DiLeonardi,* 181 F.3d 865, 868 (7th Cir.1999). The Federal Rules of Criminal Procedure and the Federal Rules of Evidence do not apply to extradition proceedings. FRE 1101(d)(3); FRCP 54(b)(5). *See also Eain v. Wilkes,* 641 F.2d at 508.

Moreover, constitutional protections applicable in criminal proceedings have been held inapplicable in the context of extradition. For example, the Sixth Amendment right to a speedy trial and the Fifth Amendment right against undue delay are inapplicable to an extradition. *Martin v. Warden,* 993 F.2d at 829; *In re Burt,* 737 F.2d at 1486. Likewise, the Sixth Amendment right to effective counsel does not apply to extradition proceedings. *DeSilva v. DiLeonardi,* 181 F.3d at 868–69. The Supreme Court has found no constitutional infirmity where those subject to extradition proceedings have been denied an opportunity to confront their accusers. *Bingham v. Bradley,* 241 U.S. at 517, 36 S.Ct. 634. *See also Esposito v. Adams,* 700 F.Supp. 1470, 1476 (N.D.Ill.1988). Finally, the Fifth Amendment guarantee against double jeopardy and the right to a Miranda warning are inapplicable to an extradition proceeding. *In re Extradition of Powell,* 4 F.Supp.2d 945, 951 (S.D.Cal. 1998).

Courts have also declined to apply American procedural constraints and constitutional rights prospectively in extradition proceedings. Most directly on point are the facts in *Caputo v. Kelly,* 19 F.Supp. 730 (S.D.N.Y.1937). In that case, a Frenchman shot his common law wife and fled to the United States. *Id.* at 732. He contested the extradition on the ground that the sole evidence against him was the deathbed accusation of his deceased wife, and such hearsay was not competent evidence sufficient to commit him to trial under the laws of New York. *Id.* at 734. The court first suggested that such evidence might indeed be admissible under the laws of New York, under the dying declaration exception to the hearsay rule. *Id.* at 736. Specifically, the court found that the circumstances surrounding her accusation seemed to indicate that she was likely to have believed her death was imminent at the time. *Id.* However, the Court ultimately found that the precise applicability of the dying declaration exception was not a pertinent issue in an extradition proceeding. *Id.* at 736. Noting that extradition proceedings are not criminal proceedings, the court found that "[t]he hearsay character of a statement is of course a factor to be considered in determining the weight to be accorded it, but that is as far as the hearsay objection goes in a proceeding like the present." *Id.* at 737 (quoting *United States ex rel. Klein v. Mulligan,* 50 F.2d 687 (1931)). In the end, the Court found that the depositions of the police officers attesting to the accusations of the deceased wife were competent evidence sufficient to support a finding of probable cause to extradite Caputo. *Id.* at 728–39.

This same principle has also been applied in more contemporary cases. For example, in *In re Burt,* the extradition of an America soldier accused of murdering a West German taxi driver was initially waived, allowing the crime to be prosecuted by American authorities. 737 F.2d at 1479. However, the American authorities subsequently declined to prosecute when they discovered that the soldier's confession would be inadmissible in an American criminal trial because he had not been properly Mirandized. *Id.* at 1480. Nonetheless, when the government of West Germany renewed its request for extradition, that request was granted. *Id.* at 1481. Likewise, in *Bloomfield v. Gengler,* the Court dealt with treaty language substantially similar to that at issue here in that it required the evidence to be assessed as if the crime had occurred here. 507 F.2d 925, 927 (2d Cir.1974). Appellant noted that his case had initially been dismissed on procedural grounds in the foreign court and argued that if the crime had occurred in the U.S. double jeopardy would have attached. *Id.* The Court agreed that double jeopardy would have

attached if the dismissal had occurred in the United States, but declined to construe the treaty language so literally as to require the application of American constitutional and procedural protections prospectively in an extradition proceeding. *Id.* at 927–28.

█ Contrary to the principles illustrated above, Fulgencio contends that the only evidence competent to support a finding of extraditability is that evidence which would be admissible in an American criminal trial. However, the Supreme Court has expressly found that "[c]ompetent evidence to establish reasonable grounds [to extradite] is not necessarily evidence competent to convict." *Fernandez v. Phillips,* 268 U.S. at 312, 45 S.Ct. 541. Indeed, some courts have suggested that competent legal evidence in an extradition proceeding is merely that evidence which is admissible by statute. *In re Extradition of Greer,* No. 91–90, 1991 WL 311924, at *6 (D.Vt. Nov.20, 1991); *Caputo v. Kelly,* 19 F.Supp. at 738. Other courts have concluded that competent legal evidence is simply that evidence which the presiding judicial officer deems sufficiently reliable to properly consider. *Mainero v. Gregg,* 164 F.3d at 1206–07; *Quinn v. Robinson,* 783 F.2d 776, 815–16 (9th Cir.1986). Indeed, the Supreme Court has found that extradition may be predicated entirely on the "unsworn statements of absent witnesses." *Collins v. Loisel,* 259 U.S. at 317, 42 S.Ct. 469. *See also In re Extradition of Salas,* 161 F.Supp.2d at 925.

### 5. Sufficiency of the Evidence

█ The Court finds the evidence submitted by the government of Mexico sufficient to support a finding of probable cause to extradite. The statement made by Gonzalez in her sworn statement was reliable. Just as in *Caputo v. Kelly,* Gonzalez identified her attacker from her deathbed. (Inj. Ex. 2 p. 1). By her own account, she believed she was dying shortly after the assault. (*Id.* at 2). There is nothing in the record to indicate that this prognosis had changed at the time of the statement. Indeed, the physician attending her diagnosed the burns as life threatening. (Inj.Ex.4). Moreover, unlike the decedent in *Caputo v. Kelly,* the statement made by Gonzalez was signed, sworn, and made under the penalty of perjury.

The statement and complaint made by Gonzalez is further corroborated by the statement of Fulgencio's father, Fulgencio Campos, who will be available to testify at trial. Gonzalez told Fulgencio Campos what had happened almost immediately after she had arrived at the home of Chavez. (Inj. Ex. 6; Inj. Ex. 7). This was only a few hours after the assault, and at the time she was severely burned, practically naked, and still in flight from her husband. (Inj.Ex.5). The Court finds that these circumstances bear a strong likeness to those necessary to admit evidence under the excited utterances exception to the hearsay rule, thus generally indicating a substantial degree of reliability. *See* FRE 803(2); *United States v. Moore,* 791 F.2d 566, 570–72 (7th Cir.1986). The statement and complaint of Gonzalez's mother also tends to contribute to the reliability of Gonzalez's accusation. In all three statements, the accounts of the assault related by Gonzalez to her father-in-law, a government investigator, and her mother, were substantially identical in their core details. This consistency, and the high likelihood of sincerity, further support the Court's finding that the evidence proffered here is sufficiently substantive and reliable to support a finding of probable cause regardless of whether they would otherwise be admissible in a federal or Illinois criminal trial.

Finally, there are clear indications in the record that Fulgencio fled Michoacan, Mexico immediately after the night of the

assault which strongly support the finding of probable cause. Fulgencio Campos stated that Fulgencio had disappeared immediately following the incident. (Inj. Ex. 6 p. 2). Fulgencio's sister informed the local police that he left his three children with her at around 3:00 a.m. on the night of the incident and never returned. (Inj. Ex. 9 p. 2). This Circuit has recognized that "[f]light is also a legitimate ground from which to infer guilt and here, at the least, lends itself to use as corroboration of [the witness's] statement in the consideration of probable cause." *Eain v. Wilkes,* 641 F.2d at 511.

The Court finds Fulgencio's contentions as to inconsistencies in the record unpersuasive. Fulgencio contends that there are discrepancies in the accounts as to whether the gasoline was poured directly or only accidently on Gonzalez. (Trans.11). Gonzalez reported in her statement that Fulgencio started to pour gasoline onto the fire, and then sprayed some onto her. (Inj. Ex. 2 p. 1). A reasonable inference from this statement is that Fulgencio intentionally poured gasoline on her. His decision to abandon his children and his wife after the incident further suggests that he deliberately set fire to his wife. One would expect a husband to visit and comfort his wife and children if he was not responsible for her injuries. Other accounts merely indicated that Fulgencio poured gasoline onto Gonzalez. (Inj. Ex. 6 p. 1; Hom. Ex. 3 p. 2–3). However, this is not necessarily an inconsistency, but is more likely a mere discrepancy in the level of detail. What's more, by all accounts Fulgencio made his homicidal intentions absolutely clear after Gonzalez had doused the fire. (Inj. Ex. 2 p. 2; Inj. Ex. 6 p. 1; Hom. Ex. 3 p. 3).

Second, Fulgencio contends the account related by Gonzalez is inconsistent because their nearest neighbor resides a mile from their house. (Trans.12–13). Again, this contention falls flat. By all accounts, Gonzalez arrived at Chavez's house a few hours after the incident. (Inj. Ex. 6; Inj. Ex. 7). She was apparently able to talk and move about when she arrived. (Inj.Ex.7). Hence, it does not seem implausible that she could have walked some distance to seek the help of her neighbor.

Finally, Fulgencio contends that the Court should be disturbed by the fact that the neighbor who came to her aid was not identified in the record. (Trans.11). However, a government need not produce all evidence necessary to ensure a conviction in order to obtain extradition. *Austin v. Healey,* 5 F.3d 598, 605 (2d Cir.1993); *Quinn v. Robinson,* 783 F.2d at 815. The statement given by Chavez seems to suggest that although she did not recognize the neighbor, she would be able to identify him at the prosecutor's or defendant's request. Regardless, providing an air-tight narrative of the events surrounding a crime is not a precondition for granting extradition. These issues, raised by Fulgencio, are all properly reserved for the eventual trial in Mexico.

## V. CONCLUSION

Pursuant to 18 U.S.C § 3184 and the Extradition Treaty between the United States and the United Mexican States, May 4, 1978, 31 U.S.T.5059, TIAS 9656, the Court finds that there has been presented sufficient evidence to compel a finding of probable cause to extradite Nicolas Fulgencio Garcia to Mexico.

*Accordingly, it is hereby adjudged, decreed, and ordered as follows:*

This matter is hereby certified to the Secretary of State.

This Certificate of Extraditability and Order of Commitment, together with all formal extradition documents received into evidence, together with a certified copy of

all testimony and evidence taken at hearings and all memoranda of law filed on the issue of extradition, and all orders of court, shall hereby be forwarded to the Secretary of State by the Clerk of the United States District Court for the Northern District of Illinois so that a warrant may issue upon the requisition of the proper authorities of the United Mexican States for the surrender of Nicolas Fulgencio Garcia according to the provisions of the Extradition Treaty between the United States and the United Mexican States, dated May 4, 1978, 31 U.S.T.5059, TIAS 9656.

Defendant Nicolas Fulgencio Garcia be and the same hereby is committed to the custody of the United States Marshal pending his surrender to the United Mexican States, or until further order of court.